[Crim. No. 17858. First Dist., Div. Three. July 2, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD LEE KNOX, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Mark L. Christiansen and Richard G. Fathy, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Michael V. Franchetti, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Paul H. Dobson and John R. Duree, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WHITE, P. J.**—Defendant and appellant Donald Knox appeals from a judgment of conviction entered upon a jury verdict finding him guilty of each count charged in the information. Count one alleged that appellant and two codefendants committed murder in violation of Penal Code section 187, and that each was armed with a handgun and used a handgun during the commission of the murder in violation of Penal Code sections 12022, 12022.5 and 1203.06, subdivision (a)(1). In count two each defendant was charged with violating Penal Code section 32 by being an accessory to the charged offense of murder. In counts three through five codefendants and appellant respectively were charged with violating Penal Code section 12021 as felons in possession of concealable firearms. A fourth defendant, John Joseph Bethony, was granted informal immunity in exchange for his testimony.

Appellant entered pleas of not guilty to the charges in the information, denied the allegations concerning the firearm, and admitted one of the two prior convictions alleged. The trial court ordered appellant's trial to proceed prior to the trials of his codefendants.

Appellant contends that his judgment of conviction should be reversed because the trial court erroneously (1) denied his suppression motion, (2) denied him a fair trial by a series of improper rulings involving the prosecution's star witness, John Bethony, and (3) permitted the alternate juror to accompany the 12 regular jurors throughout deliberations.

After lengthy consideration of appellant's first two contentions, we conclude that appellant was afforded a fair trial in which the trial court did not err. Previously, in an unpublished opinion, we reversed appellant's conviction on grounds of jury misconduct (opinion by White, P. J., Feinberg, J., concurring, and Scott, J., concurring but urging reevaluation of *People* v. *Britton* (1935) 4 Cal.2d 622 [52 P.2d 217, 102 A.L.R. 1065]). However, we were directed by the Supreme Court to reconsider our

opinion in the light of *People* v. *Valles* (1979) 24 Cal.3d 121 [154 Cal.Rptr. 543, 593 P.2d 240]. Accordingly, we affirm the judgment.

Late in the afternoon of June 19, 1976, the appellant, his two codefendants, James Murphy and Ronald McBroom, and former codefendant Bethony and the victim, John Flanery, were all gathered in appellant's apartment in Folsom. The five were affiliated with various motorcycle clubs such as "Satan's Legion," "Hell's Angels" and "Joker's Wild." Appellant, a convicted felon, was in possession of a gun.

Six days earlier, on June 13, 1976, Bethony had been shot in the side by his girl friend, Hazel Helton, also known as Blanket A—. Flanery was close to Blanket, viewing her as his "little sister."

When Flanery entered appellant's apartment on June 19, he was intoxicated. After some discussion in which Flanery indicated that Blanket was at his house under his protection, Flanery fell asleep on appellant's couch. According to Bethony, he, the appellant and the two codefendants then decided to kill Flanery, his wife and Blanket, and they discussed how to do it. According to this testimony, Bethony and one of the codefendants left appellant's apartment to get Blanket and Mrs. Flanery and return them to appellant's apartment for the triple murder. Before they had completed this mission, however, they called appellant's apartment, and learned that Flanery had already been killed. They then returned to the apartment after purchasing clothesline, plastic bags and other items used to dispose of the victim's body and conceal the murder.

Appellant denied that there had been any discussion of killing Flanery or anyone else and testified that Bethony left the apartment simply to find Blanket. Appellant testified that he drew his gun on Flanery because when Flanery awoke and was told that Bethony had gone out in search of Blanket he became angry and lunged at appellant. Appellant was disabled and Flanery was six feet two inches. Furthermore, appellant testified that the gun discharged accidentally and only appeared to strike the victim a glancing blow. Appellant had been instructed not to allow Flanery to leave the apartment, however. Both appellant and Bethony agree that codefendant Murphy then shot Flanery a second time.

*Suppression Motion*

On August 26, 1976, four police officers and a deputy district attorney made a warrantless search of appellant's apartment. They had been

advised by appellant's parole officer that appellant was "subject to a parole search" and stated their intention to search the apartment under that authority to appellant's wife when she answered the door in response to their knock. Appellant's wife was apparently cooperative and appellant acknowledged that he was under such parole condition and told the officers to "go ahead." Appellant now contends that this search was illegal and that evidence obtained as a result, including statements which he and his wife made to police officers, should be suppressed, and that the trial court erred in failing to grant his suppression motion.

On March 2, 1976, appellant had signed a parole agreement in which he stated: "I agree that my residence and any property under my control may be searched without a warrant at any time by any agent of the Department of Corrections or any law enforcement officer."

Penal Code section 3053 provides that the Adult Authority may impose any conditions it deems proper upon a parolee at the time of granting parole. It may deprive the parolee of significant constitutional rights and liberties, including Fourth Amendment rights against search and seizure. As stated in *People* v. *Thompson* (1967) 252 Cal.App.2d 76, 85 [60 Cal.Rptr. 203], certiorari denied 392 U.S. 930 [20 L.Ed.2d 1388, 88 S.Ct. 2276], "The rationale underlying this principle is that a parolee is at all times in *custodia legis.* Although he is not a prison inmate in the physical sense, he is serving the remainder of this term outside rather than within the prison walls. [Citations.] Accordingly, so far as necessary for the maintenance of parole guardianship, the status of a parolee as a prisoner is no different than that of one who remains in confinement, and, therefore, for the purpose of maintaining the restraints and social safeguards accompanying such status, the correctional authorities who supervise the parolee on parole may subject him, his home and his effects to such constant or occasional inspection and search as may seem advisable to them." Where there has been an explicit waiver, such as that signed by appellant, it has been said, "Waiver of constitutional rights in advance as a condition . . . to acquiring certain privileges is necessarily coercive but such exceptions to the Fourth Amendment requirements have long been upheld." (*People* v. *Byrd* (1974) 38 Cal.App.3d 941, 948 [113 Cal.Rptr. 777].)

In *Zap* v. *United States* (1946) 328 U.S. 624 [90 L.Ed. 1477, 66 S.Ct. 1277], the Supreme Court upheld the validity of an advance waiver of Fourth Amendment rights in a government contract situation. The California Supreme Court relied upon this case in *People* v. *Mason* (1971)

5 Cal.3d 759, 764-765 [97 Cal.Rptr. 302, 488 P.2d 630]; certiorari denied 405 U.S. 1016 [31 L.Ed.2d 478, 92 S.Ct. 1289], for its holding that appellant's waiver of Fourth Amendment rights was a proper condition to probation. There the court stated that ". . . persons conditionally released to society, such as parolees, may have a reduced expectation of privacy, thereby rendering certain intrusions by governmental authorities 'reasonable' which otherwise would be invalid under traditional constitutional concepts, at least to the extent that such intrusions are necessitated by legitimate governmental demands. [Citations.] Thus, a probationer who has been granted the privilege of probation on condition that he submit at any time to a warrantless search may have no reasonable expectation of traditional Fourth Amendment protection."

There are limits, however, to the conditions which may be imposed upon probationers or parolees, and *People* v. *Dominguez* (1967) 256 Cal.App.2d 623, [64 Cal.Rptr. 290], established a test which has been uniformly reaffirmed in later decisions of the California Supreme Court. (*In re Bushman* (1970) 1 Cal.3d 767 [83 Cal.Rptr. 375, 463 P.2d 727]; *People* v. *Mason, supra,* 5 Cal.3d 759; *People* v. *Lent* (1975) 15 Cal.3d 481 [124 Cal.Rptr. 905, 541 P.2d 545].) A condition of probation will be held invalid if it (1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality. As indicated in *Mason,* the principles applied to probationers are equally applicable to parolees, so it is proper to subject appellant's parole condition to the *Dominguez* test.

██ Appellant has two prior felony convictions, violation of Penal Code section 245, assault with a deadly weapon, and violation of Penal Code section 211, robbery. In *People* v. *Mason, supra,* and *People* v. *Giminez* (1975) 14 Cal.3d 68 [120 Cal.Rptr. 577, 534 P.2d 65], it was held that waiver of Fourth Amendment rights was appropriate where the grant of probation was to a narcotics offender. Where appellant was on probation for grand theft, a condition requiring submission to search was held valid because it was related to the crime. (*People* v. *Kasinger* (1976) 57 Cal.App.3d 975 [129 Cal.Rptr. 483].) *People* v. *Kay* (1973) 36 Cal.App.3d 759 [111 Cal.Rptr. 894, 73 A.L.R.3d 1235], held a condition of warrantless search not reasonably related to the crime for which appellants had been convicted where appellants had participated in a "sit-in" and threatened or struck police officers with sticks, brooms, and table legs. The court reasoned that these objects were not readily

concealable on the person and that therefore the warrantless search condition could be imposed only upon appellants' autos.

There is nothing in the record to indicate the exact circumstances of appellant's prior felonies. In *People* v. *Constancio* (1974) 42 Cal.App.3d 533 [116 Cal.Rptr. 910], where the record was totally silent as to the nature of the offense giving rise to the probation, the court assumed that the condition was fitting and proper for the reformation and rehabilitation of the probationer in relation to the offense for which probation was granted. Here it is reasonable to assume that the type of weapon appellant employed in the commission of robbery and assault and battery was concealable in his residence or auto and that therefore the parole condition was reasonable, and in conformity with the *Dominguez* test.

■ Finding that appellant's waiver of his Fourth Amendment rights was reasonable in view of the offense for which he was convicted, and therefore valid, the only remaining point of contention is whether police officers as well as parole or probation officers are justified in performing warrantless searches. In *Mason,* the court held valid a warrantless search made by a police officer who had previously ascertained that the defendant in question was on probation and by agreement subject to search by any law enforcement officer (5 Cal.3d at p. 762). It does not appear that the case at hand can be distinguished from *Mason* in any meaningful way.

The facts in *Mason* which led to the warrantless search were as follows: burglars broke into a hospital and stole a large quantity of hypodermic needles, drugs, a radio and other items. "At the time of the burglary, a hospital employee observed suspicious activity by two men in the parking lot; a second employee noted the license number of their car, and reported it to the police. The officers traced the car to [Mason] . . . and discovered that [he] had registered as a narcotics offender and was on probation for possessing marijuana . . . . The officers noted that one of the conditions of [his] probation required him to 'submit his person, place of residence, vehicle, to search and seizure at any time of the day or night, with or without a search warrant, whenever requested to do so by the Probation Officer or any law enforcement officer.'

"The officers went to [Mason's] residence and saw his car parked in front. One of the officers knocked on the door of the house, loudly identified himself and announced that he wanted to search the apartment. Defendant opened the door and an officer informed him that he had

reason to believe defendant had participated in a burglary and was subject to search and seizure by court order as a condition of his probation. According to the officer, defendant replied that he was subject to such a condition. Thereupon . . . the officers entered the house, searched and found in the kitchen a radio which resembled the one stolen from the [hospital]. They arrested [Mason], took him away, and subsequently searched [his] car and house, uncovering further items of contraband." (*People v. Mason, supra,* 5 Cal.3d 759, 762.) This search was held valid.

Appellant argues that *People v. Coffman* (1969) 2 Cal.App.3d 681 [82 Cal.Rptr. 782], forbids the type of practice *Mason* would allow. Appellant ignores the fact that the parolee in Coffman gave no explicit consent to warrantless searches. Appellant in fact ignores that *he* gave such consent. The cases which appellant cites as both controlling and in the *Coffman* line of authority are clearly distinguishable. In *People v. Natale* (1978) 77 Cal.App.3d 568 [143 Cal.Rptr. 629], there was no explicit waiver of constitutional rights. In *People v. Howard* (1978) 79 Cal.App.3d 46, 50 [143 Cal.Rptr. 342], police officers presented information to the defendant's parole officer he was trafficking in narcotics. Defendant was on parole from the California Rehabilitation Center, and as one condition of his parole was required to submit to searches by any law enforcement officer. The parole officer "asked" the police to conduct a search of defendant and his residence. The court held the search valid because the police did not invoke the authority of the parole agent as a mere subterfuge for a search otherwise impermissible. In the instant case, police officers had received information from a reliable informant that the homicide victim had been killed in appellant's former apartment and that appellant's couch was bloodstained as a result. Additional information indicated that appellant was in possession of a handgun. As part of their investigations into the homicide, police went to appellant's apartment looking for the couch and the gun. There is no evidence that the police were concerned with enforcing the conditions of appellant's parole per se, but appellant's parole officer had "expressed approval" of the search. In light of *Mason,* it would appear that expressing "approval" is significantly different from "asking." *Mason* clearly does not require that parole officers "instigate" a warrantless search. In *People v. Icenogle* (1977) 71 Cal.App.3d 576 [139 Cal.Rptr. 637], where a parolee was on parole with a consent-to-search provision, the court found that police officers' warrantless search was valid where they knew of the parolee's status and waiver and had reasonable grounds for believing that the parolee was engaged in criminal activity. In *People v. Kasinger, supra,* 57

Cal.App.3d 975, the court found a warrantless search by police officers under similar conditions valid. As in *Icenogle,* there were no parole officers involved.

We conclude that the trial court did not err in denying appellant's suppression motion. The evidence appellant sought to exclude was properly admitted.

### Rulings in re Witness Bethony

■ Appellant contends that he was denied a fair trial because the prosecution's star witness, John Bethony, had been given conditional immunity which precluded his effective cross-examination. The immunity agreement entered into between Bethony and the prosecution provided that, "In return for his full and truthful testimony in court, regardless of verdict concerning the homicide of John Flanery, that he would face no prosecution for that homicide provided that he was not the triggerman." Appellant argues that as a result of this agreement, Bethony was under a strong compulsion to not accept responsibility for the killing, and that the trial court should therefore have disallowed the agreement. Appellant cites *People* v. *Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133], where the accomplice-witnesses were given immunity from first degree murder prosecutions on the condition that their testimony at trial not "materially or substantially" differ from their pretrial statements. There the court said, "[A] defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." (41 Cal.App.3d at p. 455.)

■ It is considered permissible to extend immunity to one jointly charged with crime upon condition that he testify fully and fairly as to his knowledge of the facts out of which the charge arose. (*People* v. *Lyons* (1958) 50 Cal.2d 245, 265-266 [324 P.2d 556]; *People* v. *Manson* (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265], cert. den., 430 U.S. 986 [52 L.Ed.2d 382, 97 S.Ct. 1686]; *People* v. *Medina, supra,* 41 Cal.App.3d 438, 456; *People* v. *Green* (1951) 102 Cal.App.2d 831 [228 P.2d 867].) ■ The question here is whether the additional condition requiring that Bethony be absolved of blame for the actual shooting causes the agreement to fall into the type prohibited under the *Medina* rule. Did it, in other words, put Bethony "under a strong compulsion to testify in a particular fashion?" It would appear that it did not.

There is no evidence that Bethony was present at the time of the killing. Appellant's testimony is consistent with Bethony's in this regard. We find therefore that the condition which appellant argues is a "compulsion" had no significance under the facts as presented by both Bethony and appellant, and that the trial court therefore did not err in allowing the agreement.

■ Appellant contends that it was error for the trial court to deny his pretrial motion to have the prosecution's witness, John Bethony, undergo a psychiatric examination to "explore" his competency to testify truthfully. Appellant contends that Bethony's "exaggerated and contradictory statements" constituted grounds for such an examination.

The question of the competency of a witness is covered by two sections of the Evidence Code: Section 701 which provides that a person is disqualified to be a witness if he is incapable (1) of expressing himself concerning the matter so as to be understood or (2) of understanding his duty to tell the truth; and section 403 which provides, in effect, that the judge may exclude the testimony of a witness if, in his estimation, no reasonable person could find that he had personal knowledge of the circumstances. (*People* v. *Blagg* (1970) 10 Cal.App.3d 1035, 1039 [89 Cal.Rptr. 446].)

Only section 701 is relevant in the instant case. Under this section a witness is presumed competent in the absence of a showing to the contrary (*People* v. *Craig* (1896) 111 Cal. 460 [44 P. 186]; Witkin, Cal. Evidence (2d ed. 1966) Witnesses, § 768) and "It is universally recognized that the competency of a witness is to be determined by the trial court in the exercise of its judicial discretion." (*People* v. *McCaughan* (1957) 49 Cal.2d 409, 421 [317 P.2d 974].) As the court stated in *McCaughan,* "It bears emphasis that the witness's competency depends upon his *ability* to perceive, recollect, and communicate. [Citation.] Whether he did perceive accurately, does recollect, and is communicating accurately and truthfully are questions of credibility to be resolved by the trier of fact." (*McCaughan, supra,* at p. 420.)

Appellant made absolutely no showing that Bethony was an incompetent witness. The fact that he made inconsistent and exaggerated statements does not indicate that he was unable to perceive, recollect and communicate or to understand his duty to tell the truth. There is no evidence that the trial court abused its discretion in denying the motion to compel psychiatric examination of Bethony.

 Appellant argues that he should have been allowed to testify regarding his knowledge of Bethony's violent behavior in order to attack Bethony's credibility. Section 787 of the Evidence Code expressly provides that instances of specific conduct tending to prove a trait of character are inadmissible to attack or support the credibility of a witness. Although in his reply brief appellant contradicts his opening brief and says that "the testimony was offered not to prove a trait of character, but to indicate that Bethony's noninvolvement in this violent offense was dubious," Bethony's involvement is not relevant to the issue of appellant's involvement. Additionally, although Bethony did testify that "Nobody likes murder," immediately thereafter he admitted that he took part in the planning and discussion of the homicide. There is therefore no issue as to his lying about his involvement. Appellant's contention is meritless.

 Next, appellant contends that the trial court erred in refusing to allow appellant to call a former juror to testify concerning a conversation between a sheriff's officer and the witness Bethony which the juror allegedly overheard. According to one juror, Kramer, the juror in question, Conley, said to him, "Did you hear the officer? They framed that man." Juror Kramer assumed that Conley was referring to the defendant, but immediately terminated the conversation and informed the court of the occurrence. Conley denied in chambers that he had made such a statement, and further denied that he had had the impression that the officer was coaching the witness. His testimony is confused, however, as the following excerpts* indicate.

---

*Excerpts from Juror Conley's testimony are: "[The court]: Have you had any discussion with Mr. Kramer concerning the conduct of officers in the case?

"[Juror Conley]: Oh, yeah. Yeah.

"[The court]: Would you tell me what that was, please?

"[Conley]: I was waiting outside and I was waiting for you to come out and talk to me and I heard an officer standing up there yesterday saying—uh—let's see, how did he word it? I don't want to say it and not—and misinterpret.

"[The court]: Take your time. You think about it and then say what you have on your mind.

"[Conley]: He said something similar to, yes, that's right. To get the blame off of you say such and such. I couldn't hear that. I didn't hear the last part, what they said. And then he came. That's when you walked out.

" . . . . . . . . . . . . . . .

"[The court]: And now, what officer was that, do you recall?

"[Conley]: Uh, it was a black officer. He was in plain clothes sitting outside there.

"[The court]: I see. And to whom was he talking?

"[Conley]: He was talking to the defendant [sic] that was on the witness stand.

"[The court]: And he said, as I gather, he said something indicating how the witness

Appellant argues that Conley should have been permitted to testify regarding this incident, because it was relevant to impeach the credibility of the prosecution's star witness.

---

should testify?

"[Conley]: Right.

"[The court]: Can you repeat it for me now or to the best of your recollection?

"[Conley]: I remember him saying, 'That's right, to keep the blame off you and then'—the rest, the rest of the part I couldn't hear.

"[The court]: In other words, he was advising the witness to testify in a certain manner to avoid being implicated in the crime, I suppose?

"[Conley]: Right.

"[The court]: That's the impession you got?

"[Conley]: Right.

"[The court]: Now, how's that going to affect your judgment in this case?

"[Conley]: Oh, it's not going to affect my judgment any because I'm going to wait and hear all the evidence.

". . . . . . . . . . . . . . . . .

"[The court]: You expressed the opinion that the defendant in this case is being framed?

"[Conley]: No, I didn't express that to him.

"[The court]: That was the indication of his statement. Can you tell me what you felt?

"[Conley]: I didn't feel anything, really. I—I didn't hear it all, you know. I mean I was just sitting down there at the time waiting for you to come out. I didn't hear nobody say anything about frame and I did not mention anything about being framed.

"[The court]: Mr. Kramer indicated that you—he thought you said to him: 'Did you overhear the officer? They framed that man.' And thought you were referring to the defendant, Mr. Knox.

"Do you feel that Mr. Knox—

"[Conley]: No.

"[The court]:—was framed?

"[Conley]: No. I can't say Mr. Knox was framed because I haven't heard all the evidence, your Honor.

"[The court]: All right. I see. Thank you.

"Will that—that conversation that you overheard, do you think you can continue to be fair and impartial to both sides in this case?

"[Conley]: Yes, I think I can.

"[The court]: You don't feel that you'd be prejudiced against the People's case by overhearing that black officer talking to the Witness Bethoney, I take it?

"[Conley]: No.

"[The court]: It was Bethoney?

"[Conley]: No, definitely not. I don't think it would prejudice me against the people or the attorneys.

". . . . . . . . . . . . . . . . .

"[Conley]: Well, I don't—I don't recall saying, 'Did you overhear the officer?'

"[The prosecutor]: Okay. Let me then—it's an unfair question. Let me just ask you: What did you say to Mr. Kramer so that I can get that straight in my mind?

"[Conley]: Well, I believe I said to Mr. Kramer that when I met him in the store he spoke to me, him and his wife, and from that point I went one way and he went the other way. And then I met up with him again in the aisleway and uh, he stopped me again and started talking. And then I said, I—I told him, I said, 'I overheard some—an officer talking to one of the witnesses in the hallway while I was waiting for the judge.' See? And then I told him, I believe—I believe I told him what I heard just like I told you a minute ago, that—that the guy said he shouldn't—he should say anything to keep himself from

A juror in the trial of an action may not testify as a witness before the jury in that trial against the objection of a party. (Evid. Code, § 704, subd. (b).) As the comment to that section says, "A juror-witness is in an anomalous position. . . . A party affected adversely by the juror's testimony is placed in an embarrassing position. He cannot freely cross-examine or impeach the juror for fear of antagonizing the juror—*and perhaps his fellow jurors as well.* And, if he does not attack the juror's testimony, the other jurors may give his testimony undue weight. . . ." (Italics added; see also Witkin, Cal. Evidence, *supra,* § 776.) It would appear that some weight should be given to these considerations in the case of the testimony of a former juror as well. The jury may continue to identify with a witness who was until recently a member of their group in the same way they are presumed to identify with an active member of the jury. In the instant case the prosecution objected to former Juror Conley's appearing as a witness.

Although a consideration, clearly the above discussion does not strictly apply to the situation in this case. The admissibility of Mr. Conley's testimony must be considered independently of his former status as a juror.

Bethony was the prosecution's chief witness and his testimony conflicted with that of appellant in the crucial area of premeditation. Bethony testified that the killing was discussed prior to its occurrence. Appellant denied this and claimed it was a spontaneous act of self-defense. Bethony's credibility was clearly an important issue in the case.

█ Evidence Code section 787 makes inadmissible evidence of specific instances of a witness' conduct to attack his credibility when its only relevancy is to establish a trait of his character. Where, however, a specific instance of conduct is relevant to prove a witness' bias or improper motive, apart from any relevancy it has to prove a character trait, it is admissible. (Jefferson, Cal. Evidence Benchbook (1972) § 28.8.) "[E]vidence contradicting the testimony of a witness, even if it consists of proof of other wrongful acts, is proper if it is relevant to an issue in the case." (*People* v. *Clark* (1965) 63 Cal.2d 503, 505 [47 Cal.Rptr. 382, 407 P.2d 294].) █ Testimony regarding this specific act of conduct which appellant wished to elicit from Conley was admissible therefore under Evidence Code section 787.

being, you know, in trouble. Keep himself out of trouble on the case.

"[The prosecutor]: You can't remember the exact words?

"[Conley]: No, I can't remember the exact words I was saying to him because I wasn't really thinking about it when I was talking to him."

Evidence Code section 352 gives the trial judge wide latitude to exclude evidence if its probative value is outweighed by considerations that admission of the evidence will necessitate undue consumption of time, or create a substantial danger of confusing the issues or misleading the jury. The trial court in the instant case implicitly relied upon this section to exclude the proffered testimony. Both the officer in question, Detective Carter, and Bethony were questioned at length by the court in chambers, and neither admitted that the conversation had consisted of anything but the officer's urging Bethony to "tell it like it is." The trial judge weighed the conflicting accounts, believed those of Carter and Bethony and accordingly decided that Conley's testimony would be unduly prejudicial, time consuming and confusing to the jury in view of its slight probative value. The balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption ". . . is particularly delicate and critical where what is at stake is a criminal defendant's liberty." (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405, 484 P.2d 77].) In the instant case Bethony's immunity agreement with the prosecution and his relationship with the prosecution were explored at length during the trial in the presence of the jury. His credibility was therefore impeached on the very issue for which appellant wishes to offer Conley's testimony. Officer Carter had been assigned to accompany Bethony to court because both Bethony and the prosecution were fearful of Bethony's safety. There is no significance therefore in the fact that the two were standing and talking together.

It does not appear that the trial judge's decision was capricious under the circumstances. "[I]t is the exclusive province of the trial court to determine whether the probative value outweighs the possible prejudicial effect of evidence." (*People* v. *Demond* (1976) 59 Cal.App.3d 574, 586 [130 Cal.Rptr. 590].)

### Thirteen Jurors—Reversible Error?

▉ Appellant contends that it was reversible error per se for the court to order an alternate juror present in the jury room during the deliberations of the 12 regular jurors even though defense counsel stipulated to this arrangement, and the court admonished the alternate juror to be silent. Formerly, California law on this point clearly supported appellant's position. In *People* v. *Britton, supra,* 4 Cal.2d 622, 623, the court held that the presence of an alternate juror in the jury room during deliberations was reversible error, even though the court instructed the

alternate not to participate by word or action in the proceedings. The court based its holding on *People* v. *Bruneman* (1935) 4 Cal.App.2d 75 [40 P.2d 891], which, it said, "determines the issue." The *Bruneman* court had held that an alternate's presence during jury deliberations was reversible error per se even though defense counsel stipulated to the arrangement. In *Bruneman*, the court said, "the presence in the jury room of the 'alternate jurors,' to whom the case had not been submitted for decision, was an invasion of the defendant's right of trial by jury. . . . [T]his was an error so far destructive to the invaded right, that the error could not by mere consent be rendered harmless." (*Bruneman, supra*, at p. 81.)

In *Bruneman*, counsel had stipulated to the presence of the alternate juror in the jury room during their deliberations. In *Britton*, counsel had not stipulated. The law mandated reversal in either case. However, subsequent to the appeal herein, our Supreme Court in the case of *People* v. *Valles, supra*, 24 Cal.3d 121 at page 125, has concluded that "the presence of alternates in the jury room during deliberations is not necessarily detrimental to a defendant's right of trial by jury and that defense counsel may stipulate to such procedure." *Valles* presented the identical question in the instant appeal. Counsel stipulated, the court instructed the alternate juror to remain silent and not to participate in the jury's deliberations and there is no indication whatsoever that the alternate violated the court's order. *Valles* holds that in such circumstances appellant is by virtue of his stipulation estopped from raising the issue of jury misconduct.

The judgment is affirmed.

Scott, J., and Feinberg, J., concurred.

A petition for a rehearing was denied August 1, 1979.