Filed 5/11/15; pub. order 6/10/15 (see end of opn.) pub. order received 6/26/15

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARCUS MORRIS,<br><br>    Defendant and Appellant. | B254910<br><br>(Los Angeles County<br>Super. Ct. No. NA091326) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard R. Romero, Judge. Reversed.

Anthony M. Solis for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Marcus Morris of possession of cocaine base for sale in violation of Health and Safety Code section 11351.5, and Morris admitted he had suffered multiple prior convictions enumerated in Health and Safety Code section 11370.2. The trial court sentenced Morris to an aggregate term of 13 years in county jail.

We find an error under *People v. Sanders* (1988) 203 Cal.App.3d 1510 (*Sanders*) because a juror who was excused in the midst of Morris's trial was thereafter allowed to testify in the trial as a prosecution witness. We find the error implicated Morris's constitutional due process right to a fair trial, and that the error was not harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). Accordingly, we reverse the judgment.

## FACTS

Examined in light of the usual standard of review on appeal (see, e.g., *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence at trial established the following facts. On February 7, 2012, a team of Long Beach Police Department (LBPD) officers executed a search warrant at "6--- Orizaba Avenue, No. 103." During the search, officers found a bindle with .92 grams of a white granular substance containing cocaine base on a dresser in a bedroom. The officers also recovered a bindle with a .84 gram "chunk" of a substance, "maybe the size of a quarter," containing cocaine base in the bottom of a hamper filled with men's clothing on a patio that was accessible through a sliding door from the bedroom. Further, the officers found two digital scales commonly used to weigh drugs, one of which had a powdery residue on it. The officers also found $6,090 cash inside a shoebox in a bedroom closet, and $1,552 cash in a drawer of a bedroom television stand. Inside the residence, the officers also recovered Morris's wallet, which contained his driver's license identifying his address as the Orizaba Avenue property, and pieces of mail addressed to Morris at the Orizaba address.

Officer Fox searched Morris and recovered a cell phone from his pants pocket. Detective Christopher Bolt reviewed the text messages from Morris's cell phone. They included a series of text messages dated as received within days of the execution of the search warrant, including one message that was received about an hour before the search.

2

Among others, the messages read as follows: "This is brown eyes I need a 3.5 please answer I'm almost there;" "I need 30. Can I see you;" "I need 50;" "Can I get 60 bucks worth?" In the detective's experience, the text messages were indicative of requests to purchase drugs.

In May 2012, the People filed an information charging Morris with possession of cocaine base for sale. At trial in January 2014, the prosecution presented evidence establishing the facts summarized above. Morris's defense was that the police work had been sloppy and that the evidence they developed did not prove that he, as opposed to some other person, controlled the area where the drugs, scales, and cash were recovered, or that he personally possessed the items. Morris also maintained that the evidence failed to prove that he intended to sell the drugs. The jury found Morris guilty of the charged offense.

## DISCUSSION

### The Trial Court Prejudicially Erred in Allowing a Juror to Testify

Morris contends his conviction must be reversed because the trial court prejudicially erred when it permitted an excused juror to testify during trial as a prosecution witness. We agree.

*Trial Setting*

After the prosecution's police witnesses established the facts summarized above, Morris called Mary Beverly Vinoya to testify as a defense witness. Vinoya testified that she lived in the bedroom in which the approximately $7,500 cash was recovered during the execution of the search warrant. According to Vinoya, she kept her "savings" of $6,000 in a shoebox in the closet of her bedroom, and her "monthly budget" money of $1,500 in the television stand in the bedroom. Vinoya testified that she lived in the apartment with Morris's mother and Morris's son, and that Morris did not live in the apartment, but slept on a couch there a few times each week. Morris did not have access to Vinoya's bedroom, which she kept locked with a key.

3

Before Vinoya finished testifying, Juror No. 10 asked to talk to the trial court privately. At a sidebar discussion, Juror No. 10 informed the court that that he might have overheard Morris talking with Vinoya on a cell phone. Juror No. 10 explained that during the lunch break on the preceding court day, while he was in a stall in a restroom near the courtroom, he heard someone whom he believed to be Morris say, "Don't worry about it. There's some money in your pink shoes in the shoebox. You might have to come to testify." Further, "There's some money that I put in your shoes – your pink shoes in the shoebox." Juror No. 10 told the court that he was concerned his judgment might be swayed based on Morris's statements. Juror No. 10 confirmed that he had not said anything about what he had heard to any other juror because he did not put it all together until Vinoya testified she talked to Morris on the phone on the previous court day. Based on what he had heard in the bathroom, and Vinoya's testimony, Juror No. 10 believed it was likely that it had been Morris talking on the phone. At the request of Morris's counsel, the court agreed to excuse Juror No. 10 and replace him with an alternate juror, whereupon the prosecutor promptly asked the court, "Can I call him as a witness now?" The court recessed.

Juror No. 10 returned to the jury box, and the trial court advised the entire panel that Juror No. 10 was being excused and replaced with an alternate juror.[1] An instant later, outside the presence of the reconstituted jury, the prosecutor asked that excused Juror No. 10 be allowed to testify, explaining to the court that what Juror No. 10 heard contradicted Vinoya's testimony that she kept her own money in the shoebox in the bedroom closet. The prosecutor argued that Juror No. 10's evidence impeached Vinoya's credibility.

---

[1]    "The court: Back in session. This is no reflection on Juror No. 10, but I think you understand you have to be excused. So do report to the jury room.
       "Juror No. 10: Okay."

4

Morris's counsel objected to the proposed testimony, arguing that "every member of the jury panel ha[d] a personal relationship" with excused Juror No. 10. Defense counsel also objected on foundational grounds, arguing that excused Juror No. 10 had not actually seen Morris talking, and that it could not be determined if it had actually been Morris whom excused Juror No. 10 had overheard. Further, even assuming the juror had overheard Morris, there was no way to determine the identity of the person on the other end of the phone conversation. Finally, defense counsel argued that he would have no opportunity to investigate Juror No. 10's background for facts showing possible credibility issues.

The trial court ruled the testimony admissible. Because Vinoya testified she talked on the phone with Morris the preceding court day, the court found there was a sufficient foundation to show that excused Juror No. 10 heard Morris talking on the phone.

After Juror No. 10 was brought back into the courtroom, the court advised him outside the presence of the jury that he might be called as a witness and admonished him not to have any contact with the remaining jurors.

Vinoya completed her testimony, and the defense rested its case. The trial court then advised the jurors that the prosecution would likely be calling excused Juror No. 10 to testify in rebuttal, and admonished the jurors with the following cautionary instruction: "One of the instructions that you'll get . . . [is] that all witnesses are judged by the same standards. Nobody has greater credibility, nobody has lesser credibility because of who they are. A police officer, a judge, a lawyer, a defendant, a juror are all judged by the same standards. [¶] A juror is not entitled as — a former juror is not entitled to greater credibility just because he was a former juror on the case. You're not to have any sympathy, empathy, not to rely on any kind of memory you have, any contact you had with the witness when he was a juror. So he's just a witness like any other witness." The court then asked if any juror was unable to follow such instruction, and no juror indicated he or she could not.

5

Excused Juror No. 10 then took the stand and testified that he had heard Morris on the phone telling someone not to worry, and that the person might have to come to court to testify, and that Morris left some money for the person in their pink shoes in the closet.

Morris's counsel renewed the defense's objections and moved for a mistrial. The trial court denied the motion for mistrial.

*Analysis*

In 1965, the Legislature enacted Evidence Code section 704 governing the subject of a "juror as witness." Summarized, the section says that a sitting juror impaneled in the trial of an action may not be called to testify before the same jury in the trial. Evidence Code section 704, subdivision (b), provides: "(b) Against the objection of a party, a juror sworn and impaneled in the trial of an action may not testify before the jury in that trial as a witness. Upon such objection, the court shall declare a mistrial and order the action assigned for trial before another jury." Evidence Code section 704, subdivision (c), provides: "The calling of a juror to testify before the jury as a witness shall be deemed a consent to the granting of a motion for mistrial, and an objection to such calling of a juror shall be deemed a motion for mistrial."

Evidence Code section 704's purpose is succinctly stated in the comment to the section by the Assembly Committee on Judiciary: "A juror-witness is in an anomalous position. He [or she] cannot weigh his [or her] own testimony impartially. A party affected adversely by the juror's testimony is placed in an embarrassing position. [The party] cannot freely cross-examine or impeach the juror for fear of antagonizing the juror — and perhaps his [or her] fellow jurors as well. And, if [the party] does not attack the juror's testimony, the other jurors may give his [or her] testimony undue weight. For these and other reasons, Section 704 forbids jurors to testify over the objection of any party."

In *People v. Knox* (1979) 95 Cal.App.3d 420 (*Knox*), the defendant wanted to call an excused juror to testify as a defense witness, but the trial court excluded the testimony under Evidence Code section 352. On appeal, the defendant contended the court erred. The Court of Appeal correctly recognized that Evidence Code section 704, by its plain

6

language, only applies in the situation of testimony by a sitting trial juror who is called as a witness in the same trial, and does not apply when a juror who has already been excused is involved. In an ensuing discussion, the Court of Appeal ruled, without expressly deciding whether an excused juror may testify in the trial in which he or she had been a sworn juror, that the trial court did not abuse its discretion under Evidence Code section 352 in excluding the excused juror's testimony. (*Id*. at pp. 432-435.)

*Sanders, supra,* 203 Cal.App.3d 1510, went further than *Knox*, and directly addressed whether an excused juror may be allowed to testify in the same trial in which he or she had earlier been a sworn juror. In *Sanders*, the People charged the defendant with possession of marijuana for sale. (*Id*. at p. 1511.) At trial, police witnesses testified that the defendant had a dozen baggies of marijuana hidden in a hole in a wall in a vacant lot, and that the nature of the possession was consistent with a "stash location" used for the sale of the drugs. (*Id*. at p. 1512.) The prosecution then called its final witness — a former juror in the case named "Melanche" — who had been excused for cause "after the jury was sworn." Although *Sanders* is not altogether concrete in its chronology, it appears Melanche was excused before any witnesses testified, after bringing it to the trial court's attention that he recalled having seen the defendant sell marijuana in the past. Melanche testified that on two occasions about three or four months after the defendant was arrested for the offense being tried, Melanche observed the defendant sell marijuana to Melanche's brother. (*Id*. at p. 1513.) The jury convicted the defendant as charged. The Court of Appeal in *Sanders*, without discussing Evidence Code section 704 or *Knox, supra*, reversed the defendant's conviction based on constitutional due process concerns for the following stated reasons:

> "The Sixth Amendment to the United States Constitution mandates that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . .' The right to jury trial in criminal cases . . . encompasses the right to trial by an impartial jury. (U.S. Const., Amend. VI.) A basic requirement of due process is that a defendant

7

be accorded a fair trial in a fair tribunal.  (*Turner v. Louisana* (1965) 379 U.S. 466, 472-473 . . . .)

"The Sixth Amendment encompasses additional guarantees implicit in the nature of trial by an impartial jury; namely that the jury's verdict be based upon the evidence adduced at trial, uninfluenced by extrajudicial evidence or communications or by improper association with the witnesses, parties, counsel or other persons.  (*Turner v. Louisiana, supra*, 379 U.S. at pp. 472-473 . . . .)  'In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.'  (*Turner v. Louisiana, supra*, 379 U.S. at pp. 472-473 . . . .)

"*Turner* involved a jury trial in which the prosecution's leading witnesses were the same two deputy sheriffs who watched over the jury during the three-day period it was sequestered for trial.  The United States Supreme Court held that the witnesses' close and continuous association with the jurors deprived Turner of his constitutional right to trial by an impartial jury as guaranteed by the due process clause of the Fourteenth Amendment.  Although the witnesses testified they had not discussed the case with the jurors, the court found their close relationship had a prejudicial impact on the credibility attached to the witnesses' testimony.  (379 U.S. at pp. 472-473.)

"[¶] . . . [¶]

"The court commented that permitting an intimate association between the jurors and two key prosecution witnesses would have violated the basic guarantees of the defendant's constitutional right to an impartial jury even if the witnesses had not been deputy sheriffs.  The fact that they were in the role of guardian, made the association even more prejudicial

8

because 'the relationship was one which could not but foster the jurors' confidence . . . .' (*Turner v. Louisiana, supra*, 379 U.S. at p. 474.)

"It is well settled that the very character of certain procedures makes it impractical to determine the degree of prejudice to the defendant. A defendant attempting to establish that he has been deprived of due process of law during the course of his or her trial need not show actual prejudice in order to obtain relief; it is sufficient if the defendant demonstrates a 'reasonable *probability* of prejudice.' [Citations.]

"Application of these principles to the record in the instant case compels the conclusion that Sanders was deprived of his due process right to a fair trial by an impartial jury. Contrary to the People's argument, Melanche had more than a 'brief encounter' with the jury, spending at least two days with the other members of the jury panel. In addition, Melanche's fellow jurors had the opportunity to listen to his responses during voir dire, thereby gaining further familiarity with him. During this examination Melanche described his employment as a security officer at a nightclub and his observations of people smoking marijuana. He referred to his friendly relationship with police officers and their involvement in arrests made at the nightclub. . . .

"Melanche enjoyed an intimate association with the jury panel during the two-day period of voir dire examination. The record does not reveal the amount of time spent by Melanche with the other jurors but the jurors conversed with one another in the halls of the courthouse prior to court sessions and at recesses. Also, it appears that Melanche was together with the other jurors in the jury assembly room prior to the day that the case was assigned for trial. Notwithstanding Melanche's testimony that he did not speak with any jurors about Sanders's subsequent marijuana sales, this case demonstrates a reasonable probability of prejudice from his testimony as a witness. The special relationship which may develop among members

9

of a jury venire and especially members of the panel selected and sworn in a case may impermissibly permeate the jury's objectivity in the event a former juror is called as a witness. By virtue of the jury's familiarity and close association with Melanche, the jury may have attached greater credibility to his testimony. In essence, the jury's verdict in this case was not based solely on the evidence developed at trial but was prejudicially influenced by the jurors' close association with a witness in the trial. Under the facts of this case it was prejudicial error for the trial court to have permitted the prosecution to call Melanche as a witness, after he was excused as a juror.

"Inasmuch as we reverse on the basis of denial of due process of law, we need not reach the remaining contentions raised by Sanders's appeal." (*Sanders, supra*, 203 Cal.App.3d at pp. 1513-1516.)

The only difference between *Sanders* and this case is that an excused juror testified in the prosecution's case in chief, whereas, in Morris's case, an excused juror testified in rebuttal to impeach the only defense witness. We find the difference inconsequential. The problem identified in *Sanders* is that allowing an excused juror to testify in a case in which he or she had once been a juror creates a constitutionally unacceptable probability that the other jurors who ultimately decide the case may look with favorable bias on the excused juror's testimony due to their shared jury experience. This concern is as strong in Morris's current case as it was in *Sanders*. Allowing an excused juror to testify implicates a defendant's constitutional due process right to a fair trial process.

The People's urge us not to follow *Sanders*. They claim the issue in Morris's current case is largely limited to an evidentiary one, which should be viewed to determine if there was an abuse of discretion. They further assert the court did not abuse its discretion because Morris "was not entitled to exclude the . . . testimony of a percipient impeachment witness." We are not persuaded to reject *Sanders*.

10

Plainly, had the trial court declared a mistrial, and had Vinoya taken the stand at retrial and repeated her testimony, excused Juror No. 10 could have testified in rebuttal to impeach Vinoya's testimony. In other words, excused Juror No. 10 could testify for the prosecution at a trial in which he had not once been a sworn and seated trial juror. Similarly, excused Juror No. 10 could testify at a retrial. But the issue for purposes of Morris's current appeal is a bit more nuanced — was it permissible under constitutional due process precepts to have allowed excused Juror No. 10 to testify *in front of jurors who knew him* by virtue of their shared jury experience.

We acknowledge that *Sanders* discusses no specific fact or circumstance in that case which tended to indicate that any of the jurors in the case actually felt a bias in favor of the testifying excused juror. Further, there is no fact or circumstance in Morris's case tending to indicate that any of the jurors at his trial actually felt a bias in favor of excused Juror No. 10. But, in reading *Sanders*, we understand the court there not to have required any direct showing of actual juror bias; *Sanders* is concerned with the risk of possible bias, and found the risk too strong to accept that the defendant had been tried in a fair trial proceeding. As stated by the court in *Sanders*: "A defendant attempting to establish that he [or she] has been deprived of due process of law during the course of his or her trial need not show actual prejudice in order to obtain relief; it is sufficient if the defendant demonstrates a 'reasonable *probability* of prejudice.'" (*Sanders, supra*, 203 Cal.App.3d at p. 1514, quoting from *Gordon v. Justice Court* (1974) 12 Cal.3d 323, 329.)

The People argue that *Sanders*'s "reasonable probability of prejudice" standard is "completely contrary" to California Constitution, Article VI, section 13, and to *People v. Watson* (1956) 46 Cal.2d 818. The problem with the People's approach is that it is premised on a view that Morris's is claiming an evidentiary error on appeal, whereas Morris's claim is that his constitutional due process right to a fair trial is in question.[2] Because constitutional trial rights are implicated here, we find the proper test for prejudice is the standard articulated in *Chapman, supra*, 386 U.S. at page 24. In

---

[2] "'The failure to accord an accused a fair hearing violates even the minimal standards of due process.'" (*Turner v. Louisiana, supra*, 379 U.S. at pp. 471-472.)

11

*Chapman*, the United States Supreme Court was concerned with state criminal law which allowed a prosecutor to comment on a defendant's failure to testify at trial, and allowed a trial court to instruct the jurors that they could draw adverse inferences from a defendant's failure to testify at trial. Applying a "harmless beyond a reasonable doubt" standard of review, the Supreme Court found that although the prosecution had "presented a reasonably strong 'circumstantial web of evidence' against petitioners, . . . absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts." (*Chapman, supra*, 386 U.S. at pp. 25-26.)

*Sanders* evaluates prejudice based on the fact that the jurors could have been influenced by their close association with the former-juror witness. (*Sanders, supra*, 203 Cal.App.3d at p. 1515.) Although the evidence in *Sanders* was overwhelming and undisputed, the court reversed the conviction because the jurors could have been influenced by their close association with the testifying former juror. Here, Cervantes spent far more time with other jurors than the former juror in *Sanders* and easily could have developed a relationship with the other jurors. As in *Sanders*, the jurors "may have attached greater credibility" to Cervantes's testimony because they were familiar with him. (*Sanders,* at p. 1515.) Defendant's conviction therefore must be reversed.

While the evidence of possession was overwhelming, the evidence of defendant's intent to sell was not. Defendant admitted to Officer Andrew Calderon that he possessed the controlled substance, but denied any intent to sell. Intent to sell—an element of the offense—therefore was critical as the prosecutor appeared to recognize when she argued: "When the defendant possessed the controlled substance, he intended to sell it. Now, this is the big issue in this case."

Defense witness Mary Vinoya's testimony undermined the People's evidence on that element; her testimony questioned whether the money found in the closet in the bedroom with the cocaine base belonged to defendant. She testified that she did not have a bank account and kept her "savings, which is $6,100, in my shoes in the closet – my shoebox . . . a nike shoebox." Vinoya's testimony therefore contradicted a principal basis

12

for Officer Christopher Bolt's opinion that defendant possessed the cocaine base *for sale*. Officer Bolt's opinion was the primary evidence that defendant possessed the cocaine base for sale. Officer Bolt testified that the money was a "big factor" in his conclusion defendant possessed the contraband for sale. During closing argument, the prosecutor exploited the error in admitting Cervantes's testimony by suggesting that defendant bribed Vinoya for her testimony.[3] The introduction of Cervantes's testimony impeaching Vinoya—the only defense witness—was not harmless beyond a reasonable doubt. Reversal is therefore required.

## DISPOSITION

The judgment is reversed.


                                              BIGELOW, P.J.

We concur:


        FLIER, J.



        GRIMES, J.

---

[3]     Specifically the prosecutor argued: "Then you heard from Mr. Cervantes who came in and talked about that conversation that he heard. Is the defendant bribing her for her testimony? Is the defendant referring to the money that he put in that shoebox in 2012?"

Filed 6/10/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B254910 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA091326) |
| v. | |
| MARCUS MORRIS, | **ORDER CERTIFYING PUBLICATION** |
| Defendant and Appellant. | (No Change in Judgment) |

THE COURT*:

The opinion in the above entitled matter filed on May 11, 2015, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

\* BIGELOW, P. J.                    FLIER, J.                    GRIMES, J.

14