[Crim. No. 15331. Fourth Dist., Div. One. June 19, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ROLAND TALAMANTEZ, Defendant and Appellant.

## COUNSEL

Jeffrey J. Stuetz, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jay M. Bloom and Steven H. Zeigen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STANIFORTH, Acting P. J.**—The amended information accused defendant Roland Talamantez with the murder of Richard Heggie. (Pen. Code, § 187.) Three special circumstances were alleged: (1) Talamantez killed the victim because of his race (Pen. Code, § 190.2, subd. (a)(16)); (2) Talamantez killed Heggie while in commission of kidnaping (Pen. Code, § 207), in violation of Penal Code section 190.2, subd. (a)(17)(ii); and (3) Talamantez intentionally killed the victim while inflicting torture upon him (Pen. Code, § 190.2, subd. (a)(18)). It was also charged Talamantez suffered three prior felony convictions (Pen. Code, § 667.5, subd. (b)). After denial of a series of pretrial motions and upon a jury trial, Talamantez was convicted of murder in the first degree based upon a finding of torture murder. The special circumstances of murder by torture, killing because of race and killing during the commission or attempted commission of a kidnaping, were found to be true. Upon bifurcated trial of the penalty phase, the jury returned a verdict fixing the punishment at confinement in state prison for life without possibility of parole. Talamantez was sentenced to state prison for life without possibility of parole plus two years for prior convictions. He appeals, charging multiple errors.

## FACTS

About 9:15 a.m. on July 30, 1980, the body of Richard Heggie was discovered below a highway turnout near Warner Springs. The autopsy established numerous external injuries to the victim's eyes, neck, forehead and ribs. A blow from the front or side had caused an injury to the mesentery of the victim's intestines and in addition Heggie's voice box had been broken. Death was caused by injuries to the neck with the damaged mesentery being a contributing factor.

Heggie met his death in this manner: On July 29, 1980, various people living on the Los Coyotes Indian Reservation met at the local swimming pool. Those present included John Cassell, his brother Robert, Scott Deatherage, Joe Rozzo, Aussie Vito, Alvin Curo, Ken Gorman, Glen Duro and Talamantez, Duro's half-brother. With Talamantez was 15-year-old Edie Ortiz. They spent the day at the pool, leaving occasionally to purchase more beer or wine. About 5 o'clock that afternoon Cassell and others went to get more beer. They were to meet Talamantez at Gorman's gas station to pick up a CB radio to trade for more beer. On the way to the gas station, Cassell saw a black man—victim-to-be Heggie—walking along the road. At this time nothing was said or done. The group obtained, exchanged the radio for more beer.

As the group was walking back to the truck, Cassell heard Talamantez say "We're going nigger hunting." Five people, including Cassell, Deatherage, Rozzo, Talamantez and Ortiz, climbed in the truck. On the way back to the reservation the walking black man was again seen. Talamantez told Deatherage to stop the truck. Deatherage made a U-turn and stopped. Talamantez left the truck, approached Heggie, saying "Hey, nigger" and started punching him. Glen Duro in another car approached on the opposite side of the road. The group in Duro's car watched the beating. Heggie pleaded to be left alone but Talamantez and Rozzo (who had said "Let me at that nigger") threw him onto the bed of the truck and continued to pound on him. Deatherage told Talamantez to remove Heggie from the truck. Rozzo dragged Heggie to Duro's car and threw him in the trunk.

The group in Duro's car decided to turn Heggie over to the sheriff. They drove into the driveway of Curo's residence to wait for the truck. When the truck did not arrive, the others went looking for it. The truck riders were found walking because the truck had a flat tire. Duro told Talamantez his group intended to turn Heggie over to the sheriff. Talamantez agreed but said if Heggie was not wanted by the sheriff, he wanted to stab him.

The group drove to the gas station but no one had a dime to telephone the sheriff. Talamantez then said "Come on, let me stab him." Duro's group then drove two miles to a large turnout on the roadway where Talamantez and Rozzo dragged the pleading victim from the car. They battered him for a further 10 to 15 minutes until they got tired. They took a break from their attack to have a beer. During this time Heggie crawled down an embankment away from the attackers. Talamantez yelled "You are not going anywhere, nigger. This is where you are going to die." Talamantez and Rozzo followed Heggie down the embankment and continued beating him.

Deatherage testified he went down the embankment to prevent Talamantez from using his knife on the victim. He saw Talamantez attacking Heggie and telling Rozzo to hit Heggie in the throat. Deatherage returned to the car. Choking and gasping sounds were heard.

Talamantez and Rozzo returned to the car. Talamantez laughed and said "This is the hardest nigger I ever killed." Rozzo admitted he squeezed the victim's Adam's apple until it "busted." Talamantez threatened he would get anyone who told what happened. The group returned to the swimming pool.

The day after the killing Talamantez drove to Gorman's gas station and told Ms. Banner to say nothing about his being seen at the reservation. He told Gorman "That nigger was in the wrong place at the wrong time." He said he had killed Heggie even before Rozzo choked him. Talamantez appeared proud of his acts. Gorman reported this statement to the deputy sheriff.

After Talamantez' arrest, and while in the county jail, he was involved in smuggling heroin into the jail. As a result, a conversation between Talamantez and a visitor to the jail was monitored (July 11, 1982). During that discussion Talamantez spoke of the need to prevent Edie Ortiz from testifying at his trial because she could hang him. Although he ordered her kidnaped, she was never abducted. Talamantez also made similar unsolicited statements to an inmate in the county jail.

The defense tendered a diminished capacity defense based upon a claim of Talamantez' brain damage and intoxication. There was evidence from several witnesses of heavy drinking. Substantial medical evidence suggested Talamantez suffered from substantial long-term chronic alcoholism and as a result had chronic brain damage. Talamantez also sought to blame the killing on Cassell and Deatherage. Against this factual backdrop, Talamantez makes multiple contentions of trial court error.

DISCUSSION

I

Talamantez contends the trial court never properly informed the jury that it would first have to find a murder, i.e., an unlawful killing of a human being with malice aforethought, before finding first degree murder under a torture theory. ■ As a general rule, " '. . . If the killing was not murder, it cannot be first degree murder, and a killing cannot become murder in the absence of malice aforethought. Without a showing of malice, it is

immaterial that the killing was perpetuated by one of the means enumerated in the statute. . . .' " (*People* v. *Dillon* (1983) 34 Cal.3d 441, 465, fn. 11 [194 Cal.Rptr. 390, 668 P.2d 697].) ■ However, in cases involving the felony-murder doctrine, malice aforethought is not an essential element of first degree felony murder. Independent proof of malice is not required in such cases. (*Id.*, at p. 465.)

■ The failure to instruct on an essential element of a crime may be prejudicial per se. A defendant is entitled to have a jury determine every material issue essential to establishing guilt. (*People* v. *Hill* (1983) 141 Cal.App.3d 661, 668-669 [190 Cal.Rptr. 628].) Talamantez complains the court's jury instructions on murder and first degree torture murder "did not convey to the jury that the essential element of malice aforethought had to be established before there could be a guilty verdict of first degree murder under a torture theory." However, examination of the instructions actually given reflects the jury was fully and properly instructed on the elements of murder (including malice aforethought) as well as the elements of murder by torture—defined as murder in the first degree. There was no need to reinstruct using different language.

■ Talamantez next complains of the instruction given in connection with the definition of torture murder. In part, the jury was charged: "The crime of murder by torture does not necessarily require any proof that the defendant intended to kill the deceased . . . ." This instruction was properly given and for the following reasons: The court first defined *murder* most carefully and correctly. The court began the definitions of murder in the first degree by first giving a complete and accurate definition of premeditated murder, then murder in the first degree by torture was defined. It was in connection with the torture murder definition that the challenged statement was made.

The legal reason for such instruction is clear. A determination that *torture* was involved establishes the degree of the murder. If there is a murder and the murder is committed through torture, then it is by definition a first degree murder. The instruction clearly stated murder which is perpetrated by torture is murder of the first degree. Before the jury could reach a determination of torture murder in the first degree, the jury must have concluded there had been a murder as previously defined by the court. In so doing the jury must have reached the conclusion Talamantez acted either with express or implied malice. Under these instructions for first degree murder by torture, there must have been independent proof beyond a reasonable doubt the crime was murder (that is, an unlawful killing with malice aforethought). (*People* v. *Dillon, supra,* 34 Cal.3d 441, 465.) In addition there must have been a similar degree of proof of coldblooded, calculated

intent to inflict extreme and prolonged pain for the purposes of revenge, extortion, persuasion or for any sadistic purpose. (*People* v. *Wiley* (1976) 18 Cal.3d 162, 173, fn. 4 [133 Cal.Rptr. 135, 554 P.2d 881].)

The argument made here by Talamantez was urged upon this court in *People* v. *Lynn* (1984) 159 Cal.App.3d 715 [206 Cal.Rptr. 181]. This court held the instructions as given were not misleading, although the jury was not told in so many words it must first decide whether the crime constituted murder before it constituted torture murder. ■ This court said: "This argument ignores the fundamental rule that all instructions must be read together and the determination whether the jury was correctly instructed is made from the entire charge of the court (see *People* v. *Northrop* (1982) 132 Cal.App.3d 1027, 1037-1038 . . . .) The trial court fully and correctly instructed on murder and on malice. It followed these instructions with others defining premeditation and deliberation, robbery and its lesser included offense and then went into torture murder under CALJIC No. 8.24 which commences, '*Murder* which is perpetrated by torture is murder in the first degree' (italics added)." (*Id.*, at p. 729; fn. omitted.) ■ Since the jury was correctly instructed on malice as a necessary element of murder, there could be no confusion regarding the foundational requirement of malice aforethought which preceded the torture murder instruction.

Talamantez argues (without factual support) the jury relied upon the second degree felony murder based upon kidnaping to make a finding of malice. It unequivocally did not. The jury here made a specific finding the crime was murder by torture, a finding necessarily predicated on a subfinding that the act which caused the death involved a high degree of probability of death. The jury was so instructed pursuant to CALJIC No. 8.24. This express finding mandates a finding of implied malice based on this record where the act was unquestionably committed for a base antisocial purpose in wanton disregard for life. What Talamantez' intent was in kidnaping Heggie is not relevant to the verdict actually rendered. The jury's verdict indicates on its face Talamantez not only acted with malice but specifically intended to torture the victim.

## II

■ Talamantez next asserts the trial court failed to give CALJIC No. 3.31 which relates to the "union of joint operation of act and intent" and contends this omission was prejudicial per se, requiring reversal. This argument should be examined in connection with Talamantez' contention a jury must be instructed to find a wilful, deliberate and premeditated intent to kill in order to find murder by torture.

 The Supreme Court in *People* v. *Steger* (1976) 16 Cal.3d 539 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206], stated: "[M]urder by means of torture under section 189 is murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." (*Id.*, at p. 546.) The statement in *Steger,* however, must be read in light of the later case, *People* v. *Wiley, supra,* 18 Cal.3d 162, where the Supreme Court dispelled any doubt arising from the language in *Steger* as to whether a wilful, deliberate and premeditated intent was required as an element of murder by torture. The Supreme Court explained: "Our use, in *Steger,* of the words 'wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain,' refers only to the requirement that before the trier of fact may convict a defendant of first degree murder by torture there must be found a cold-blooded, calculated intent to inflict such pain for one of the specified purposes. Inasmuch as the Legislature has equated this state of mind with the wilful, deliberate, premeditated intent to kill that renders other murders sufficiently culpable to be classified as first degree murder, *it is unnecessary in torture-murder to also find that the killing itself was 'willful, deliberate, and premeditated.'* " (18 Cal.3d 162, 173, fn. 4; italics added.)

 The instruction given in this case was identical to that given in *Wiley.* It was a correct statement of the law. Furthermore, a careful examination of the *Steger* language *in context* shows the *Steger* court was not directing the inclusion of a specific intent requirement when defining the intent required to commit murder by torture. The Supreme Court said: "We do not hold that a defendant must have had a premeditated intent to *kill* in order to be convicted of murder by means of torture . . . but he . . . must have the defined intent to inflict pain." (*People* v. *Steger, supra,* 16 Cal.3d 539, 546.)

 The jury here was instructed specifically to determine whether Talamantez committed acts "with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, or persuasion or for any sadistic purpose." This is a precise and correct statement of the law. The evidence here is strong and conclusive Talamantez exhibited a coldblooded intent to make the victim suffer excruciating pain. "Nigger . . . you're going to die here." The nature of the death imposed allows for no other conclusion.

### III

 Talamantez next urges the trial court committed prejudicial error per se in failing to instruct the jury that causation is an essential element of the torture murder. He cites *People* v. *Mitchell* (1982) 132 Cal.App.3d 389, 395 [183 Cal.Rptr. 166], and an Arizona case, *State* v. *Brock* (1966) 101

Ariz. 168 [416 P.2d 601], for the proposition an essential element of torture murder is *the death must have been caused by torture.* He asserts the jury could have convicted him of first degree torture murder without having to find beyond a reasonable doubt Heggie's death was caused by torture. By this argument Talamantez seeks to segregate the different types of punishment inflicted upon Heggie in torturing him to death. Talamantez would break down the torturing into blows versus strangulation versus crushing of a voice box. He argues the strangulation which crushed the voice box may not have constituted a torturous act. This argument cuts the murder-by-torture cheese too thin. The murder-by-torture finding encompasses the totality of brutal acts and circumstances that led to Heggie's death. Talamantez' suggestion to break the torture into various constituent—blows, abuses, strangulations—elements would result in the conclusion that none, taken by themselves, resulted in the death. It was the whole series of brutal and cruel acts, the continuum of sadistic violence directed against Heggie which constituted the torture. It may have been one of several vicious acts described which culminated in breaking the victim's voice box. The continuous beating on or about Heggie's intestinal area gave rise to the secondary cause of death according to the coroner.

Implicit in the jury finding Talamantez was guilty of murder is the finding he acted with malice. In its verdict of murder by torture, the jury had to find the acts constituting torture resulted in Heggie's death. Thus, the face of the verdict itself finds, announces that causal connection. There is no sound factual or legal basis for a contention the instruction regarding causation should have been given on the facts of this case. Not a scintilla of evidence suggests the torturous conduct did not result in the death of Heggie.

In view of the completeness and correctness of the instructions given, the claim of lawyer incompetence regarding purported instructional error falls of its own weight. Nor was the diminished capacity instruction negated or undercut by these instructions. The jury was specifically told to determine the extent to which Talamantez' "reduced mental capacity" affected his ability to "form an intent to kill or form the intent to torture."

## IV

*The Crime of Murder by Torture as Defined by the Trial Court Was Not Unconstitutionally Vague*

■ Talamantez next contends the crime of murder by torture as defined by the trial court is unconstitutionally vague because part of the court's definition used the phrase "cruel pain," citing as authority *People* v. *Su-*

*perior Court (Engert)* (1982) 31 Cal.3d 797 [183 Cal.Rptr. 800, 647 P.2d 76].

The *Engert* court examined the special circumstance language of Penal Code section 190.2, subdivision (a)(14), focusing its attention primarily on the word "especially" as it modified "heinous, atrocious, cruel." Since all murder, by definition, would be heinous, atrocious and cruel, the *Engert* court found the use of the word "especially" unconstitutionally vague; it would lead to guesswork as to when and how the finding could be made. (*People* v. *Superior Court (Engert), supra,* 31 Cal.3d 797, 801-802.) The Supreme Court expressed concern as to how the term " '*unnecessarily*'·torturous" could be defined since it presupposed there was such a thing as *necessary* torture. (*Id.,* at p. 803; italics added.) In analyzing this latter phrase, the *Engert* court referred to the "*straight-forward*" *language of* [*Penal Code section 190.2*] *subdivision (a)(18)* [which enumerated a special circumstance when] '[t]he murder was intentional and involved the infliction of torture.' " (*Id.,* at p. 802, fn. 2, italics added.)

The trial court here used the adjective "cruel" in describing "pain" when defining torture to the jury. The dictionary defines torture as "the inflicting of intense pain . . . to punish or coerce." (Webster's New Internat. Dict. (3d ed. 1961) p. 2414.) "Cruel" is the equivalent of "extreme" or "severe" pain in the definition of torture.

The concept of torture, considered in this straightforward manner, does not have the definitional uncertainty as did the language in *Engert* where the attempt was to define "especially cruel" and "*unnecessarily* torturous." Thus, unlike the vagaries of meaning possible in that special circumstance situation, the use of the word "cruel" by the trial court here did not render unconstitutionally vague the definition of torture. (See *People* v. *Smith* (1984) 35 Cal.3d 798, 809 [201 Cal.Rptr. 311, 678 P.2d 886].)

## V

*Any Error in Failing to Instruct in Accordance With People v. Beeman, 35 Cal.3d 547, Was Harmless*

▮▮ Talamantez contends the trial court erred in failing to instruct the jury that aiding and abetting requires that a defendant intentionally aid and abet the crime, as held in *People* v. *Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875]. In *People* v. *Beeman* (1984) 35 Cal.3d 547, 561-563 [199 Cal.Rptr. 60, 674 P.2d 1318], the California Supreme Court agreed with

the *Yarber* court that CALJIC No. 3.01 (given in this case)[1] does not adequately inform a jury of the criminal intent required to convict a defendant as an aider and abettor. The court held "the weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" *(Beeman,* at p. 560.)

▪ In *Beeman, supra,* the California Supreme Court was asked to hold that failure to instruct on criminal intent violates due process by removing the element of intent from the jury's consideration and thus required automatic reversal of a conviction. *Beeman* noted the United States Supreme Court split four to four in *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969], on the question of whether *Sandstrom* error *(Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450]) required a reversal per se rule or may be reviewed for prejudice under the *Chapman*[2] standard applicable to errors of federal constitutional dimension. *(Beeman, supra,* 35 Cal.3d 547, 561, fn. 4.) *Sandstrom* held a due process violation resulted from instruction with a presumption that relieves or lightens the prosecution's constitutional duty to prove every element of a criminal offense beyond a reasonable doubt. In *Beeman* the court found the failure to correctly instruct was prejudicial, requires reversal, even under the most lenient *Watson*[3] standard.

The Supreme Court reasoned: "Under these circumstances, *where the defense centered on the very element as to which the jury was inadequately instructed and the jurors' communication to the court indicated confusion on the same point, we cannot find the error harmless.* Even applying the most lenient *Watson* standard, we find that in this case it is reasonably probable that the jury would have reached a result more favorable to appellant had it been correctly instructed upon the mental element of aiding and abetting. *(People* v. *Watson, supra,* 46 Cal.2d 818.) Because we reverse under *Watson we do not in this case decide whether failure to correctly instruct on the element of criminal intent should as a general rule be reviewed under a stricter rule of harmless error."* *(Beeman, supra,* 35 Cal.3d 547, 563-564; italics added.)

---

[1] "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime. [Mere presence at the scene of a crime and failure to take steps to prevent a crime do not in themselves establish aiding and abetting.]"

[2] *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

[3] *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].

*Beeman* noted, however, "While the error which flows from the giving of CALJIC No. 3.01 is not identical to a conclusive presumption or to placing the burden of persuasion on the defendant [citation], it is just as effective—if not more effective—in removing the issue of intent from the jury's consideration. [Citation.]" (35 Cal.3d 547, 561, fn. 4.)

The prejudice standard requiring reversal for *Beeman* error is thus at present at the Supreme Court level an unresolved question. Talamantez asserts, however, *Beeman* error is reversible per se under the federal Constitution, following the decision of this court in *People* v. *Acero* (1984) 161 Cal.App.3d 217 [208 Cal.Rptr. 565] (hg. den. Jan. 18, 1985).[4]

In *Acero,* this court held instruction with CALJIC Nos. 3.00 and 3.01 effectively removed the issue of criminal intent from the jury's consideration by allowing the jury to convict Acero of attempted murder without finding he *intentionally* aided or encouraged the offense. *Sandstrom, supra,* held: " '[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of *every* fact necessary to constitute the crime with which he is charged.' " (442 U.S. 510, 520 [61 L.Ed.2d 39, 48], quoting *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].) The California Supreme Court in *People* v. *Modesto, supra,* echoes this fundamental concept in stating "the defendant has a constitutional right to have the jury determine every issue presented by the evidence." (59 Cal.2d 722, 730.)

Our Supreme Court's recent pronouncement on the effect of misinstruction on the intent required for a finding of a felony-murder special circumstance under the 1978 death penalty initiative (Pen. Code, § 190.2, subd. (a)(17)) in *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], offers a fair analogy, enlightens our search for the correct review standard here. *Garcia* holds where the instructions "completely eliminated the issue of intent to kill from the consideration of the jury," a reversal of the special circumstance finding is required. (*Id.,* at p. 554.) Under controlling decisions of the United States Supreme Court [*Winship, Sandstrom,* and *Connecticut* v. *Johnson, supra,* among others] the failure to instruct upon intent as an element of a special circumstance, because it takes the issue of intent from the trier of fact, it denies the defendant due process of law in violation of the Fourteenth Amendment. (*People* v. *Garcia, supra,* 36 Cal.3d 539, 549-554.)

---

[4]The error, Talamantez asserts, deprives him of his right under the California Constitution to have the jury determine every material issue presented by the evidence and thus constitutes a miscarriage of justice under the state Constitution, no matter how substantial the evidence of guilt may seem. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33].)

*Garcia* recognizes four exceptions to this rule, two based on *Connecticut* v. *Johnson, supra,* 460 U.S. 73, would allow affirmance " 'if the erroneous instruction was given in connection with an offense for which the defendant was acquitted and if the instruction had no bearing on the offense for which he was convicted' and 'if the defendant conceded the issue of intent.' " (*People* v. *Garcia, supra,* 36 Cal.3d 539, 554.)

"The third exception is based on *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 . . ., and provides that the failure to give a *Carlos* instruction is harmless error where ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." ' (*People* v. *Garcia, supra,* 36 Cal.3d at p. 555, quoting from *People* v. *Sedeno, supra,* 10 Cal.3d at p. 721.)

"The fourth exception is fashioned after *People* v. *Cantrell* (1973) 8 Cal.3d 672, 685 . . . and *People* v. *Thornton* (1974) 11 Cal.3d 738, 768-769, footnote 20 . . . . Thus, 'there may . . . be cases where the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration.' (*People* v. *Garcia, supra,* 36 Cal.3d at p. 556, fn. omitted.)" (*People* v. *Whitt* (1984) 36 Cal.3d 724, 735 [205 Cal.Rptr. 810, 685 P.2d 1161].)

 Are any of these exceptions applicable here? Was the factual question posed by the omitted instruction necessarily resolved adversely to Talamantez under other properly given instructions? The jury found Talamantez guilty of first degree murder on the basis of "murder torture." Also, there was a special circumstance finding by the jury that Talamantez "intentionally murdered RICHARD HEGGIE and that murder involved the infliction of torture, within . . . Penal Code section 190.2(a)(18)."

The jury's specific findings were responsive to the following instructions: "Murder which is perpetrated by torture is murder of the first degree.

"The essential elements of such a murder are:

"One, the act or acts which cause the death must involve a high degree of probability of death, and

"*Two, the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, or persuasion or for any sadistic purpose.*

*"The crime of murder by torture does not necessarily require any proof that the defendant intended to kill the deceased, nor does it necessarily require any proof that the deceased suffered pain."* (Italics added.) and

"To find that the special circumstance referred to in these instructions as murder involving the infliction of torture is true, each of the following facts must be proved:

"One, the murder was intentional.

"Two, that the murder involved the infliction of torture.

"To prove the infliction of torture, the infliction of extreme physical pain must be proved, no matter how long its duration.

"Awareness of pain by the deceased is not a necessary element of torture." and "If defendant was not the actual killer, it must be proved beyond a reasonable doubt that he intentionally aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of the murder in the first degree before you are permitted to find the alleged special circumstance of that first degree murder to be true as to defendant."

Furthermore, Talamantez placed his specific intent in issue in putting forward a diminished capacity defense in relation to the special circumstance (torture murder) charge: "In any of the special circumstances alleged where specific intent or purpose is an element of the special circumstance, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the special circumstances with which he is charged."

In light of these instructions, we cannot agree with Talamantez' contention that, in this instance, such failure to instruct requires reversal. In *People* v. *Beeman, supra,* 35 Cal.3d 547, 561-563, the California Supreme Court made it clear a trial court's failure to instruct on the intent required of an aider and abettor does not necessarily constitute reversible error. The *Beeman* court concluded the error required reversal of the conviction in that case because "on this record it is impossible to conclude that the jury necessarily resolved the same factual question that would have been presented by the missing instruction." (35 Cal.3d at p. 555.) In this instance, however, the record actually compels the conclusion that the jury resolved, in

a manner adverse to Talamantez, the factual question which would have been presented by the missing instruction on aiding and abetting.

Secondly, the facts of this case do not suggest any instruction concerning the mental element of an *aider and abettor* to torture murder was required. Nothing in this factual record hints at a lack of intent on Talamantez' part to torture Heggie. He expressed his intent to put him to death.

The victim, Richard Heggie, a Negro male. adult, was walking along Highway 79 near Warner Springs at approximately 8 p.m. He was observed by nine persons (in two vehicles, truck and car) including the three defendants. Talamantez said "Let's go Nigger hunting." Defendant Duro, driving a white car, turned around and contacted Heggie. Talamantez commenced the beating of Heggie. He was joined by codefendant Rozzo. Together they continued beating upon the victim. Talamantez said "Let's take him some place and kill him." Talamantez then forced the victim into the trunk of Duro's car and Duro drove the victim to a turnout on Highway 79. At one point, Duro said he would let the victim go if he had no outstanding warrants. No one had a dime to call the sheriff. Talamantez then opened the trunk, pulled the victim out and he and Rozzo resumed beating the victim. The victim pleaded for his life but was told by defendants he would die. Talamantez asked for a knife to stab the victim but witnesses refused to give it to him. The victim crawled down an embankment pursued by Talamantez and Rozzo. Witnesses heard Talamantez call out "Choke him, choke him," and heard the victim crying out and struggling; then silence. Talamantez and Rozzo returned to the vehicle. Talamantez said the victim was dead; Rozzo said he "choked him so hard he heard his Adam's apple snap."

Contrast *Beeman* facts—Beeman refused to be present at the robbery. Contrast *Whitt*, where the "intent to kill" was in hot contest in both the penalty phase and guilt phase. The facts suggest that to Whitt the shooting was a surprise, a reflexive action. (36 Cal.3d 724, 735.) Contrast *Garcia*, where defendant was not present but seated in a car at some distance when the shooting occurred in a store holdup. (36 Cal.3d 539, 545.)

The evidence here is in total contrast to *Beeman, Garcia* and *Whitt*. It establishes without conflict Talamantez voiced intent to kill Heggie; he participated in the cruel beating to the point where Rozzo broke Heggie's voice box causing death.

Talamantez' statement regarding "nigger hunting," the assault on the victim at the roadside, throwing the victim into the trunk of Duro's vehicle, and the final assault at the turnout clearly reveal he acted with the requisite knowledge and intent. In short, his intent was not in factual issue except as

it was submitted to the jury in the context of his defense of diminished capacity.

The fact (if it be a fact) that Talamantez did not strike the final torturous blow that broke Heggie's voice box and caused his death does not convert him factually into an aider and abettor to torture murder. These bitter convicting facts show him violently beating, torturing Heggie up to the point of Rozzo's coup de mort.[5] If a wrong, a confusing instruction was given, the error at most is nonprejudicial because, beyond any reasonable doubt, had the jury been correctly instructed, the jury would not have reached a result more favorable to Talamantez. There is no miscarriage of justice here. (Cal. Const., art. XI, § 13.) Given the facts of this case and the instructions actually given, the failure to instruct per *Beeman* was harmless beyond any reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 711].)

## VI

Talamantez next contends his conviction "must" be reversed because the statements he made to county jail inmate Daniels violated the principles of *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1964], and *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183].

*Massiah* and *Henry* rest on Sixth Amendment principles involving an interference, by governmental agents, with an accused's right to counsel. The government cannot use a paid informant to "deliberately elicit" incriminating information from a defendant who is under indictment and in custody, and who believes he is speaking to someone who is ostensibly a fellow inmate. (*United States* v. *Henry, supra,* 447 U.S. 264, 270 [65 L.Ed.2d 115, 122].)

The record here reflects Officer Anderson intercepted a letter from Daniels to another inmate which described a heroin smuggling operation being conducted by a "heavy vato" in the county jail. Anderson learned the "heavy vato" was Talamantez. Daniels agreed to and did provide information on the heroin operation to authorities. Daniels was instructed to obtain information from Talamantez only about the drug dealings. As a result of information on heroin dealing provided by Daniels, Talamantez' conversation with a visitor was monitored on July 11, 1982, in which Talamantez mentioned kidnaping witness Edie Ortiz.

---

[5]Codefendant Rozzo, in a separate trial, was found guilty of second degree felony murder based upon kidnaping.

Daniels also testified Talamantez told him details concerning the murder of Heggie. In so doing, Talamantez was not responding to any questions from Daniels; Talamantez would read from the preliminary transcript of his case, make comments about jury selection. He voluntarily related what occurred on the night of Heggie's death. Daniels received an early release after supplying the information on the narcotics operation.

In sum, Daniels worked for Anderson, informed on a different crime from that for which Talamantez was in custody. The information supplied by Daniels was restricted to a narcotics operation operated in the county jail by Talamantez. When Talamantez chose to relate the details surrounding Heggie's death, it was not in response to any questions by Daniels. It was not Daniels' role to act as an informant on Heggie's murder.

 This distinction is crucial. "[T]he mere presence of a jailhouse informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations would not necessarily be unconstitutional. In such a case, the question would be whether the informant's actions constituted deliberate and 'surreptitious interrogatio[n]' of the defendant. If they did not, then there would be no interference with the relationship between client and counsel." (*Henry, supra,* 447 U.S. at p. 276 [65 L.Ed.2d at p. 126].) Justice Powell noted in his concurring opinion in *United States* v. *Henry, Massiah* does not prohibit the introduction of spontaneous statements not elicited by governmental action. To establish infringement of the Sixth Amendment right to counsel, it must appear the informant's contact with Talamantez was the "functional equivalent of interrogation." (*Id.,* at p. 277 [65 L.Ed.2d at p. 126].)

## VII

Talamantez next argues his decision not to testify was based on a mistaken belief Proposition 8 (Cal. Const., art. I, § 28, subd. (f)) applied and would have rendered him susceptible to impeachment by all his many prior felony convictions. In fact, Proposition 8 applies only to crimes committed after June 9, 1982. (*People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].) The crime here occurred before the passage of Proposition 8, although the trial occurred after that date.

In response to Talamantez' *Beagle (People* v. *Beagle, supra,* 6 Cal.3d 441) motion to preclude impeachment by his prior felony convictions, the district attorney argued to the trial court the authority to impeach in light of existing law. The court considered the motion, and without referring to Proposition 8, preliminarily ruled Talamantez' 1978 conviction for receiving stolen property could be used to impeach. In reaching this decision, the

court exercised its discretion and weighed the various factors involving the prior felony as affecting credibility. *The only person arguing for application of Proposition 8 was defense counsel.* At no time did the trial court rule Proposition 8 applied to permit unlimited impeachment of Talamantez with his prior convictions.

There is absolutely no factual support for the conclusion Talamantez' decision *not to testify* was based on any application of Proposition 8. Talamantez did not testify but his defense was, in essence, presented through the testimony of the psychiatric witnesses. This factual context gives rise to no mandate for reversal.

### VIII

Talamantez next contends he was denied an opportunity to present a complete defense by virtue of three evidentiary rulings by the trial court. Near the victim's body at the crime scene were found several beer cans. Three cans were retrieved and were taken to the laboratory for fingerprint analysis. The fingerprints found on the cans did not match Talamantez'. By the time of trial the fingerprint cards had been accidentally lost. Talamantez' *Hitch* (*People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]) motion was denied and the court refused to dismiss the charges or impose sanctions. The court found the evidence was not material because the source of the cans was unknown and declined to impose sanction. The district attorney did not intend to use the evidence.

The prosecution has an unqualified obligation to disclose the existence of *material* evidence to a defendant and a correlative duty to preserve such evidence without a request to do so. If evidence is missing, a defendant has the preliminary burden to establish its materiality. Once materiality appears, sanctions will be imposed unless there is a showing the agency involved attempted in good faith to adhere to specific procedures designed to preserve such evidence. (*People* v. *Hitch, supra,* 12 Cal.3d 641, 652-653.)

In reviewing a ruling on a *Hitch* motion, the same standard of appellate review is applicable as in a Penal Code section 1538.5 suppression motion to the extent the ruling is based upon factual determinations. (*People* v. *Goss* (1980) 109 Cal.App.3d 443, 454 [167 Cal.Rptr. 224].) In the first place, there is no showing here the missing evidence was relevant; that is to say, it would have been probative on the issue of guilt or innocence of Talamantez. Witness Deatherage testified he had been down the bank at the time Heggie was killed. Deatherage's prints on the can would signify nothing except *his* presence. If the can had revealed Cassell's fingerprints

(again, a noncharged person) these fingerprints would in no way tell whether Cassell threw the can over the bank or participated in the assault on Heggie. Admittedly, Cassell was in the car near the death scene. How these prints would point to his participation in or guilt in killing Heggie is not made clear.

A stipulation was read to the jury by the court which resulted in counsel being able to argue the *absence* of Talamantez' prints on these lost cans. It could also be inferentially argued that the prints of Cassell and Deatherage could have been found on the cans. However, such inference does not give rise even to the mere possibility that an item of information might have helped the defense or might have affected the outcome of the trial. These are blind alley inferences. They fail to establish materiality in a constitutional sense. (*People* v. *Brown* (1982) 138 Cal.App.3d 832, 836 [188 Cal.Rptr. 324].) We find no abuse of discretion in the court's actions here.

## IX

Defense counsel sought to present specific instances of Cassell's and Deatherage's past violent conduct when intoxicated, which did not result in a conviction of either Cassell or Deatherage, to prove they might have acted similarly on the night of Heggie's death. Defense counsel sought to question witnesses concerning their knowledge of Deatherage's reputation for violence when intoxicated. The court refused to permit such questioning, relying upon *People* v. *Knox* (1979) 95 Cal.App.3d 420, 432 [157 Cal.Rptr. 238]. The ruling was correct although the reasoning was not. *Knox* involved an attempt to impeach a witness' credibility through reputation evidence. This was prohibited by Evidence Code section 786. Here, the evidence is prohibited by Evidence Code section 1101.

Finally, Talamantez argues there was error in failing to instruct on CALJIC No. 2.91 concerning the existence of a reasonable doubt as to the identity of the defendant as the perpetrator. CALJIC No. 2.91 concerns consideration of the circumstances of the identification. There is no issue of identity here in the sense of who was present in the group at the scene where Heggie died and who was in the ditch when Heggie was killed. The issue is, *as the defense counsel argued,* who was directly responsible? Who went down the ditch? Who of those admittedly present tortured Heggie to death? Talamantez was unequivocally identified as one of the perpetrators of the murder. He repeatedly declared his intention, admitted his own participation, his own presence. There was no error in the failing to give CALJIC No. 2.91.

## X

Talamantez next contends the decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], requires reversal of the special circumstance findings. The Supreme Court in *Carlos* concluded the 1978 death-penalty initiative (Pen. Code, § 190.2, subd. (a)) should be construed to require an intent to kill or to aid in a killing as an element of the felony-murder special circumstances. In the recent case of *People* v. *Garcia, supra,* 36 Cal.3d 539, the Supreme Court applied the test of *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24, 36-37 [196 Cal.Rptr. 704, 672 P.2d 110], and concluded the *Carlos* decision should be applied retroactively to all cases not yet final. (*People* v. *Garcia, supra,* at p. 549.) Thus we conclude it was error for the trial court *not* to give an instruction as to the intent to kill or aid in the killing as an element of the felony-murder special circumstance charge. The question remains as to the appropriate test of prejudice to apply. Does the standard set forth in *People* v. *Watson, supra,* 46 Cal.2d 818, or the higher standard of *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710], apply?

The evidence established beyond any reasonable doubt Talamantez intended to kill, did kill the victim while he was engaged in the act of kidnaping him. It was Talamantez' idea of "going nigger hunting." Talamantez ordered Deatherage to stop the truck. Talamantez first assaulted Heggie and forced him into the trunk of Duro's vehicle. At the turnout, Talamantez pursued Heggie, saying "You're not going anywhere, nigger. This is where you're going to die." He asked for his knife in order to cut the victim. He ultimately exclaimed "This is the hardest nigger I ever killed." Thereafter Talamantez threatened witnesses to the crime, admitted his involvement to two other persons and suggested that witness Edie Ortiz should be taken care of because she could "hang him."

In this factual context no other conclusion can follow but that Talamantez had an intent to kill the victim in the course of committing the felony kidnaping. Any error in failing to instruct the jury as to the requisite *Carlos* principles was harmless error beyond any reasonable doubt.

Additionally, the jury here made specific findings not only as to a kidnaping special circumstance but also as to torture and racially motivated murder special circumstances. As to these latter two special circumstances the jury was required to find, respectively: "The murder [of Heggie] . . . *was intentional and involved the infliction of torture within the meaning of Penal Code section 190.2, subdivision (a)(18).*" (Italics added.) and "*The victim was intentionally killed* . . . because of his race . . . within the meaning of

Penal Code section 190.2, subdivision (a)(16)." (Italics added.) The court instructed in order to find special circumstance of murder because of race, each of the following facts must be proved: (1) the defendant intentionally killed the victim and (2) the murder was committed because of the race of the victim. Concerning the torture murder special circumstance, the following facts "must be proved:" (1) the murder was intentional, (2) the murder involved the infliction of torture. Under these instructions the jury could not have found Talamantez guilty of either the torture or racially motivated murder special circumstance without also finding he possessed the requisite intent to kill Heggie. The recitation of facts taken in the light most favorable to the judgment point to Talamantez' being the actual killer, not just an aider and abettor. Assuming, contrary to the overwhelming evidence, Talamantez aided and abetted the actual killer, the facts here and the instructions warrant a finding Talamantez intended to murder Heggie. His intention was expressed both in words and deeds. While the instructions here are not precisely in the language of *Carlos* as to these latter two special circumstances, yet beyond any reasonable doubt no prejudice arose.

It is true a failure to define an essential element of a crime is prejudicial per se. This court has consistently so held. (*People* v. *White* (1980) 101 Cal.App.3d 161, 169 [161 Cal.Rptr. 541]; *People* v. *Haney* (1972) 75 Cal.App.3d 308, 312 [142 Cal.Rptr. 186].) This, however, is not a case calling for application of the per se prejudice rule because this case does not involve failure to instruct but rather a failure to instruct exactly in accord with the *Carlos* language. If the *Chapman* v. *California, supra,* standard does apply, then the evidence here is of such nature as to say beyond a reasonable doubt no other result would be forthcoming had a *Carlos* instruction been given.

Talamantez' argument "the jury could have vicariously found that defendant 'intentionally murdered' Richard Heggie and that murder involved infliction of torture . . . and defendant 'intentionally killed' Richard Heggie because of his race . . . without *actually finding defendant intended to murder or kill*" (italics added) tortures rational thought as well as the English language. If the jury was required as the instructions charge to find Talamantez intentionally murdered Heggie by torture or intentionally killed him because of his race, it is difficult to see how the jury understood anything but that an intent to kill was required.

## XI

In a last ditch effort, Talamantez points to the fact the special circumstance provision of Penal Code section 190.2, subdivision (a)(16), which the jury found true, requires that the victim was intentionally killed

because of his race, color or *religion*. He argues this special circumstance finding must be reversed because it violates the establishment clause of the First Amendment of the United States Constitution. He contends all special circumstances in subdivision (a)(16) must fall, including killing because of race because a law including a special circumstance enhancing punishment for religious killings is one respecting the establishment of religion. The discussion, citation of authority concerning freedom of religion is irrelevant because this case deals with a racially motivated torture murder. The statute applied has nothing to do with the religious affiliations, if any, of the victim or of the murderer. The argument "Its [the statute's] primary effect advances religion and discriminates against nonreligion" is without factual or legal basis. A similar argument was made in *State* v. *Vogenthaler* (1976) 89 N.M. 150 [548 P.2d 112, 90 A.L.R.3d 1119] where a New Mexico statute made it a crime to deface churches. Said the New Mexico court: "Such a provision does not advance religion; all it does is to provide a penalty for conduct resulting in damage to a church." (*Id.*, at p. 114.)

Also without merit is Talamantez' argument the racial murder special circumstance charge deprives the accused of his right to a jury drawn from a representative cross-section of the community because, in fact, no persons of the victim's race will be able to serve impartially and fairly. The citation of cases regarding the systematic exclusion of blacks from a grand or petit jury has no relationship whatsoever to the inability to find persons of victim's race qualified to fairly judge a charge of a racially motivated murder.

Consider the result if this argument had any validity. Whenever there was a divergence of ethnicity between a defendant and the victim of murder, rape or any other crime, the argument could be made as to the objectivity brought to the jury by any member of an involved racially, ethnically, culturally recognizable group. This argument could extend as well to women sitting as jurors in rape cases. Would their gender prevent them from being objective in such cases? If because of ethnicity or gender or any other basis in fact there is some subjective disposition against a particular defendant then voir dire and various peremptory and for cause challenges are available to the defendant as a remedy.

### XII

Finally, we find no error in the trial court's denial of the motion for new trial. Counsel fecklessly suggests the trial court was ignorant of the essential elements of torture murder in finding malice not an essential element of a torture murder. Again, we would suggest counsel carefully read *Wiley* and *Steger*.

Talamantez' counsel also claims the trial court's ignorance precluded it from properly exercising discretion in its striking the special circumstances. (*People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029].) The trial court gave a lengthy statement summarizing the facts of the case in response to the motion to strike. The court concluded Talamantez had assumed the leadership in the group that attacked Heggie. The court most aptly observed the crime involved violence, bodily harm and a high degree of cruelty, insensitivity, viciousness and callousness. No abuse of discretion appears in the trial court's refusal to strike the special circumstances in this case. In view of the horrifying and cruel murder of Heggie committed by Talamantez, the punishment meted out to him was perhaps less than appropriate in even a most merciful society.

Judgment affirmed.

Butler, J., concurred.

**WORK, J.**—I concur with the discussion in part VI, holding Talamantez' in-jail statements are admissible evidence. However, the lead opinion again does not refer to the decision in *People* v. *Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161], the primary authority Talamantez cites. As relevant here, *Whitt* merely adopts the holding of *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], and *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183], and does not state any principle which would make Talamantez' statements inadmissible.

As to the balance of the lead opinion, I concur only in the result.

A petition for a rehearing was denied July 5, 1985, and appellant's petition for review by the Supreme Court was denied September 25, 1985.