Filed 11/4/14  P. v. Hopkins CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL JASON HOPKINS,<br><br>    Defendant and Appellant. | B251614<br><br>(Los Angeles County<br>Super. Ct. No. MA058432) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Carlos Chung, Judge.  Affirmed.

　　　　D. Inder Comar, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Michael Hopkins, convicted of two counts of interfering with executive officers in the commission of their duties (Pen. Code,[1] § 69), making criminal threats (§ 422), and violating a domestic violence protective order (§ 273.6, subd. (a)), appeals his conviction on two grounds: (1) that a mistrial should have been declared after an alternate juror recognized a police officer witness and disclosed a negative experience with him; and (2) that the court erred in admitting evidence of his prior bad acts. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Signora Harrison dated Michael Hopkins from May to October 2012. Their relationship ended when he struck her. She obtained a domestic violence restraining order against him.

On January 12, 2013, Hopkins came to the residence Harrison shared with two male roommates and began arguing with one of them, David Combs, because Combs would not let him in the house. Hopkins sounded angry. Harrison concealed herself behind a door but looked around the door to see what was happening. Hopkins told Combs, "I'll kill your little white ass." Combs continued to refuse Hopkins entry because of the restraining order.

Harrison went to the door and found Hopkins "ranting and raging." He left for a moment and then returned. Harrison went outside to speak with him in hopes of defusing the situation. Hopkins told her to go away, so she re-entered the house and locked the security door. Hopkins briefly walked away and then returned, telling them through the door, "I'm tired of this shit. I'll kill all you mother fuckers up in here." Hopkins was looking at Harrison when he made this statement. One of Harrison's roommates called 911.

Harrison was afraid for her safety: "You never know how Michael is going to react so I got scared because he will walk away and then he will go to windows. He broke out windows in my house before so I just didn't know what he was going to do next. So, yes, I got scared." Hopkins was "very vengeful" and did not "let anything go."

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

Los Angeles County Sheriff's Deputies Justin Ruppert and Macias[2] responded to the 911 call. Ruppert saw that Hopkins was within 100 yards of Harrison's home. He was walking, yelling, and throwing his arms up in the air. According to Ruppert, when he (Ruppert) exited the police vehicle to speak to Hopkins, "I saw him and saw him taking his jacket off and he was yelling at me, walking westbound on the sidewalk coming directly towards me, and he threw his jacket on the ground next to the palm tree." Ruppert testified that Hopkins was "extremely aggressive and immediately I recognized that he had his fists clenched, his arms were rigid from his sides. He definitely appeared to intend to fight me." Hopkins approached Ruppert at the police vehicle and said, "You can't fuckin' stop me, you fuckin' white cop." He told Ruppert, "I'll fuckin' kick your ass."

At this point, the men were about eight feet apart. Ruppert attempted to de-escalate the situation, backing up while telling Hopkins that he was not in trouble and was not under arrest, but that he needed to speak with him about what had happened. Ruppert also drew his taser gun and warned Hopkins to stop advancing. Hopkins stopped moving toward Ruppert. Hopkins kept saying, "Fuck you," and "Fuck the sheriffs." Ruppert instructed Hopkins to turn around and to put his hands behind his back so that he could detain Hopkins for further investigation, to which Hopkins responded with a further "Fuck you." Several times Hopkins repeated that he was going to "kick [Ruppert's] ass," and he also said that he would do the same to Macias. He then looked at Macias and said, "Fuck her. I'm gonna stick a piece of metal in her." Ruppert had spent approximately one and one-half to two minutes attempting to defuse the situation, but after the threat to Macias Ruppert became concerned that Hopkins was possibly armed with a knife and was threatening to stab her. He concluded that he was unable to calm Hopkins and that more deputies and a supervisor were needed. Macias radioed for backup. Hopkins could be heard in the background yelling "Fuck you" as Macias made the radio transmission.

---

[2] Macias's first name is not in the record.

Hopkins stepped off the curb and came toward Ruppert in an aggressive manner, and Ruppert believed that he was going to attack him. Ruppert told Hopkins four or five times to stop, turn around, and put his hands behind his back, but Hopkins answered with more profanity. Ruppert tased Hopkins, who fell to the ground. Hopkins then became more cooperative in response to verbal commands, although he continued to yell as before. The two officers worked together to handcuff Hopkins, and then additional officers arrived on the scene.

Hopkins, now handcuffed, continued to be verbally aggressive, and he began to kick his legs in the air and to try to get up. The sergeant who had arrived on the scene ordered the officers to place a hobble, a nylon strap with clips, upon his legs to prevent him from kicking further. After the hobble was placed on Hopkins, officers helped him up from the ground and attempted to search him. Hopkins continued to yell and kept one fist closed tight, leading officers to be concerned that he could be secreting a small weapon in that fist.

The sergeant ordered Hopkins multiple times to open his hand, but he did not comply. She and another officer tried to pry Hopkins's hand open but were unsuccessful. Accordingly, she ordered that Hopkins be tased again. After being tased, Hopkins opened his right hand, which was holding money. Officers helped him up from the ground and placed him in the back of a patrol car. Throughout the experience, Hopkins continued to yell obscenities at the officers.

Once placed in the patrol car, Hopkins was driven to the hospital for taser dart removal and a medical examination. Throughout the drive to the hospital, Hopkins continuously yelled at the officer driving the patrol car, stating that he hated "white people" and "white cops," and challenging him to remove the handcuffs so that he could "beat your mother fucking white ass back to Santa Clarita." The officer who drove Hopkins to the hospital deemed Hopkins too volatile to be removed from the car as per the usual practice, and instead asked that the doctor come to the police car to perform the examination. While they were waiting for the doctor, Hopkins managed to slip out of his seat belt and began kicking the window of the patrol car. Hopkins stopped kicking after

4

being warned that he would be pepper-sprayed, but he continued his tirade. Deputies held Hopkins down to prevent him from injuring the doctor who was examining him. Hopkins was driven to the local jail with two patrol units following in case Hopkins managed to kick out the window of the car in which he was riding. At the station, his booking was videotaped and numerous officers were present in case of violence and to protect the officers against liability in the event they had to use force on him. Hopkins's handcuffs were not removed until he was placed in a cell because of concerns he would harm a staff member.

At trial, after the opening statements but before the presentation of evidence, an alternate juror advised the court that he recognized Ruppert as an officer who had responded unprofessionally to a call he had made to law enforcement. The alternate told the court that Ruppert, while on duty, came to his home while holding a beer and with a girlfriend in his car. Defense counsel moved to excuse the juror and to order him back as a witness. The court excused the juror but denied the request to call him as a witness. Defense counsel's subsequent motion for a mistrial was denied. Also at trial, the court permitted evidence to be introduced of several instances of domestic violence, over defense objection.

Hopkins was convicted of two counts of interfering with an executive officer, making criminal threats, and violating a domestic violence restraining order. He appeals.

**DISCUSSION**

### I.      Failure to Grant Mistrial

Hopkins argues that it was reversible error for the court not to grant a mistrial at the beginning of the case when an alternate juror recognized Ruppert and claimed that he had responded unprofessionally to a call. According to Hopkins, a mistrial should have been granted and the juror made available to him as a potential witness because he had evidence that "Ruppert committed professional misconduct, and which would have called Ruppert's credibility, reliability, and conduct as an arresting officer into question."

5

"[A] motion for a mistrial should be granted only when '"a [defendant's] chances of receiving a fair trial have been irreparably damaged."'" (*People v. Ayala* (2000) 23 Cal.4th 225, 282 (*Ayala*).) The trial court should grant a mistrial when it "'is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 198.) We find no abuse of discretion in the denial of the mistrial motion.

When confronted with the alternate juror recognizing Ruppert as the officer with whom he had a negative experience, the court properly recognized that it could not simply excuse the juror and then permit the juror to testify as a witness in the same proceeding. (*People v. Sanders* (1988) 203 Cal.App.3d 1510, 1513-1516; see also Evid. Code, § 704, subd. (b).) The court, therefore, proceeded to consider whether the alternate juror's testimony was admissible in order to ascertain whether it should grant a mistrial to permit future testimony by the alternate juror. (See *People v. Knox* (1979) 95 Cal.App.3d 420, 434-435 [admissibility of former juror's testimony considered independently of his former status as a juror, and the testimony is evaluated under Evidence Code section 352].)

The court here relied upon Evidence Code section 352 in determining whether or not the testimony that could be developed from the alternate juror would be admissible. After questioning the alternate juror in detail, the court also questioned Ruppert, who denied the juror's allegations of unprofessional conduct. The trial court then explicitly relied on Evidence Code section 352 and ruled that the potential evidence related to issues not presented by this case: the juror would at best have evidence relating to a lack of a professional demeanor, while the case concerned Ruppert's use of force. Because the evidence fell into "two different categories" of evidence concerning law enforcement officers, the alternate juror's evidence "would be too tangential and irrelevant," and "[i]t would confuse the issues." There was no reason to grant a mistrial to permit investigation into this juror's account and the development of this evidence, because, the

6

court observed, the court would "exclude it all anyways" under Evidence Code section 352.

We find no abuse of discretion here. The trial court was well within its discretion when it concluded that evidence of the alleged incident involving Ruppert and the alternate juror was inadmissible under Evidence Code section 352 because it was tangential and not relevant to the use of force issues presented by the instant case, and because it would have tended to confuse the issues. Presentation of this evidence would have required holding a trial within a trial, and it would have amounted to no more than impeachment of Ruppert on a collateral matter. (See *People v. Quartermain* (1997) 16 Cal.4th 600, 625-626 [no abuse of discretion to exclude impeachment on collateral matter].) The court's evidentiary conclusion was not "arbitrary, capricious, or patently absurd." (*People v. Thomas* (2012) 53 Cal.4th 771, 806.) Because the court reasonably concluded that evidence substantiating the alternate juror's claim would have been inadmissible, the court had no reason, and no obligation, to grant a mistrial to permit further development of that evidence. Hopkins could not demonstrate that his chances of receiving a fair trial were irreparably damaged (*Ayala*, *supra*, 23 Cal.4th at p. 282) by being denied the opportunity to substantiate the juror's account when the resultant evidence would be inadmissible. Accordingly, the trial court did not abuse its discretion when it denied the mistrial motion.

Hopkins argues that the denial of the mistrial motion also "implicated" his Sixth Amendment right to cross-examination and his right to due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. "It is axiomatic that the accused in a criminal trial must be provided a reasonable opportunity to effectively cross-examine the witnesses against him. [Citation.] At the same time, however, the 'trial judges retain wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on . . . cross-examination[,] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' [Citation.] The confrontation clause "'guarantees an opportunity for effective cross-examination, not cross-

7

examination that is effective in whatever way, and to whatever extent, the defense might wish."' [Citation.]" (*People v. Ducu* (1991) 226 Cal.App.3d 1412, 1414-1415.) Hopkins cross-examined Ruppert extensively about the issues presented in this case. Denying Hopkins the ability to cross-examine Ruppert about issues not relevant to the case or to impeach him on collateral matters is within the latitude of judges to impose reasonable limits on cross-examination. Hopkins has not established a violation of the Sixth Amendment here.

Nor has Hopkins demonstrated any violation of due process in refusing to grant a mistrial in order for him to develop further evidence on a collateral matter for impeachment. While the due process right of a defendant to a fair trial and the right to present all relevant evidence of significant probative value to the defense trumps Evidence Code section 352, "[t]his does not mean that an unlimited inquiry may be made into collateral matters; the proffered evidence must have more than 'slight-relevancy' to the issues presented" and "must be of some competent, substantial and significant value." (*People v. Northrop* (1982) 132 Cal.App.3d 1027, 1042, disapproved on other grounds in *People v. Smith* (1984) 35 Cal.3d 798, 807-808.) The exclusion of tangential evidence does not deny a defendant due process of law. (*People v. Loker* (2008) 44 Cal.4th 691, 730.)

## II.     Evidence of Prior Acts

Prior to trial, pursuant to Evidence Code section 1109,[3] the prosecution asked to introduce evidence of five incidents involving Hopkins and Harrison that had occurred within six months immediately prior to the incident that gave rise to the present

---

**3**     Evidence Code section 1109, subdivision (a)(1) provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence" within the prior 10 years is admissible, unless it is deemed more prejudicial than probative pursuant to Evidence Code section 352. Both charged and uncharged acts of domestic violence are admissible to show a defendant's propensity to commit such crimes. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233.)

proceedings. The prosecution also sought to introduce evidence of three prior convictions suffered by Hopkins pursuant to Evidence Code sections 1101, subdivision (b),[4] and 1109.

Defense counsel objected to the introduction of the prior incidents and convictions on the ground that the "sheer number" of the incidents sought to be introduced would cast Hopkins "in an extremely negative light" that would "necessarily influence the jury." Counsel argued that the evidence sought to be introduced was cumulative, "b[ore] little similarity to the current charged offenses," and created "a substantial danger of undue prejudice." Defense counsel asked that the evidence be excluded under Evidence Code section 352 because it would confuse the issues, mislead and prejudice the jury, and consume too much time. While advocating for the evidence to be excluded in its entirety, in the alternative defense counsel requested that the prior matters be limited to the more recent events, incidents in which the victim was Harrison, and a maximum of "maybe 1 or 2 matters."

The court concluded that the five prior incidents from 2012 involving Hopkins and Harrison would be admitted. The court also authorized the prosecution to introduce evidence of two prior convictions suffered by Hopkins, but not a third conviction from 2002 involving a different victim, as that would be "cumulative and tangential." The court explained that under Evidence Code section 352, "I am to weigh the probative value versus the undue prejudice. The probative value here is high. All of the past incidents and convictions put the [section] 422 [criminal threats; count 3] in context." The trial court explained the probative value of the evidence: "The jury has to find that the victim was in sustained fear. When you have a victim who knows that this defendant has been violent toward her in the past where the authorities, including the judicial

---

**4**      Evidence Code section 1101, subdivision (b) authorizes the admission of prior conduct evidence "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

system, has stepped in, where he has been convicted through that process and yet he continues to be violent and continues to pursue her, that adds a great amount of fear. It would be different if someone were just persistent but here we have someone that is persistently violent. Law enforcement and the courts have stepped in. He's been convicted and yet he continues to engage in this conduct. That heightens the level of fear for the average person, so the probative value is incredibly high." The court observed that the past acts were "not unduly violent or gruesome" and that the evidence was not cumulative. Ultimately, the court concluded, any undue prejudice did not substantially outweigh the probative value of the evidence and the evidence was "relevant to the victim's sustained fear." Furthermore, the court concluded, the evidence was admissible under Evidence Code section 1101, subdivision (b) to show Hopkins's motive and intent.

On appeal, Hopkins argues that the court abused its discretion in admitting the prior incidents and convictions and that this error deprived him of his constitutional right to due process and a fair trial. In determining admissibility under Evidence Code section 352, the court must determine whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (Evid. Code, § 352.) The court's ruling is reviewed for an abuse of discretion. (*People v. Thomas* (2011) 52 Cal.4th 336, 354-355.) We find no abuse of discretion and no constitutional violation.

The trial court properly concluded that the evidence of the five prior incidents had substantial probative value under Evidence Code section 352 because of their similarity to the present counts of criminal threats and violating a domestic violence restraining order. Each of the 2012 incidents involved an angry Hopkins threatening or harming Harrison or disobeying the restraining order she had obtained, and all occurred at the same residence where the present incident took place. On July 25, Hopkins called Harrison a bitch, spit on her, and threatened to "beat [her] ass." On August 2, angry that she had filed a police report regarding him, Hopkins grabbed Harrison and left visible scratches and bruises on her arms. On October 22, an agitated Hopkins slapped

10

Harrison's face repeatedly after she asked him to leave. This incident led to Harrison obtaining a restraining order against Hopkins, because "you never know when he is going to react or how he was going to react or when he is going to get mad. And at first I got scared of him." On October 25th, the day he was served with the restraining order, Hopkins came to Harrison's residence and banged on Harrison's windows and door; and on October 31st he returned, rang her doorbell and banged on her bedroom window. These incidents showed Hopkins's pattern of hostility and abusive conduct towards Harrison and revealed that his aggression was not diminishing with the passage of time. He remained fixated on her and disobeyed the restraining order requiring him to stay away from her. Similarly, the two prior convictions were probative because they involved domestic violence incidents (violations of § 243, subd. (e)(1) and § 273.5), and the latter conviction involved Harrison as a victim and included Hopkins being served with a restraining order.

The trial court reasonably determined that the prior incidents and convictions were not unduly prejudicial. Evidence is unduly prejudicial if it is likely to "provoke emotional bias against a party or to cause the jury to prejudge the issues on the basis of extraneous factors." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1008.) The five prior incidents themselves were not unduly violent or gruesome, and they were no more inflammatory than the charged offenses, which involved an enraged Hopkins threatening to kill everyone in Harrison's home. (See *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119 ["[r]elevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct"].) The two prior domestic battery convictions were similar to the instant charges but were no more inflammatory than the present acts, especially considering that the jurors were not informed of the underlying facts of the prior convictions and that the convictions came in by way of stipulation and brief testimony about a page of a section 969b packet. We find no abuse of discretion, and therefore no violation of due process or the right to a fair trial, in admitting these prior acts and convictions.

11

Hopkins, however, argues that the evidence was unduly prejudicial because the prior acts were "significantly more inflammatory" than those alleged here. We disagree with Hopkins's characterization: Hopkins's furious rage and death threats to Harrison and her roommates represented a significant escalation over his conduct in the prior incidents presented to the jury. Moreover, considering that the prior incidents of domestic violence involved similar conduct by Hopkins against the same victim, and none of the incidents were unduly violent or grisly, the evidence was not unduly inflammatory. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029 [holding that in light of the fact the evidence involved the defendant's history of similar conduct against the same victim, the evidence was not unduly inflammatory].)

Hopkins also argues that undue prejudice resulted when the evidence of his prior acts was supplemented by the evidence of his prior convictions and the testimony of three officers who responded to the prior incidents. We have reviewed the testimony concerning the felony conviction, as well as the testimony of the three officers who had responded to the prior incidents, and find no basis for concluding that this evidence, alone or in conjunction with Harrison's testimony about prior events, was more prejudicial than probative or that it created a substantial risk of undue prejudice.

Next, Hopkins suggests that the fact that the majority of the prior acts testimony involved the same victim, Harrison, diminishes its probative value because it its source was not independent of the evidence of the charged offense, relying on *People v. Ewoldt* (1994) 7 Cal.4th 380, 404. *Ewoldt* is inapplicable here because it concerns the admission of evidence under Evidence Code section 1101 in a circumstance where there were multiple victims and the uncharged conduct was introduced for the purpose of showing a common design or plan. (*Id.* at pp. 403-404.) Here, in contrast, the evidence was admitted to show Hopkins's intent and motive towards his sole victim, as well as under Evidence Code section 1109 as propensity evidence and to provide context for Harrison's fear of Hopkins, an element of the charge of making criminal threats.

Next, Hopkins contends that the other acts evidence confused the jury because for four of the five prior incidents, Hopkins was not charged or convicted. Hopkins argues

12

that the jury had to determine whether the prior events testified to by Harrison had actually occurred, and that "the fact that much of the testimony came from Ms. Harrison herself, significantly decreased the certainty of appellant's commission of those prior acts and increased the likelihood of confusing the issues under Evidence Code section 352." We have reviewed the record and find no likelihood of confusion or any indication that consideration of the prior incidents unduly taxed the jury. Harrison's testimony regarding the prior events was not disproportionately lengthy and was corroborated by succinct police testimony and recorded 911 calls. While Hopkins argues that the jury may have seen the trial as an opportunity to punish Hopkins for what he had done in the past to Harrison, the trial court specifically admitted one of the prior convictions to minimize any potential of misplaced punishment, commenting, "where there is a past conviction and the jury knows about that they will not be tempted to then punish him now for past bad acts knowing he has been previously punished." Hopkins's speculative argument that he was punished not for the charged offenses but for his prior acts is unsupported by any indication in the record that the jury was confused or punished Hopkins for his prior misconduct.

Finally, Hopkins argues that the court "could easily have limited the introduction of such testimony by introducing this evidence through judicial notice or stipulation. Instead, the jurors saw pictures of alleged injuries, heard clearly extraneous testimony from a prosecution paralegal and finally heard additional, cumulative testimony from police officers." We have reviewed the evidence in its entirety and identify no respect in which the trial court abused its discretion with respect to the amount of evidence presented or the manner in which it was presented. Harrison's testimony with respect to prior incidents was not particularly lengthy: her direct testimony as to all five prior incidents consumed only ten pages of the reporter's transcript. The testimony of each of the three law enforcement officers concerning the prior incidents was similarly brief. One officer was asked a total of five questions, and her testimony took up two pages of the reporter's transcript. The next officer's testimony consumed four pages of the reporter's transcript. The final officer's testimony was recorded on five pages of

13

transcript.  The paralegal's brief testimony concerning the conviction contained in Hopkins's prison packet did turn out to be repetitive in light of the stipulation that was presented at the close of evidence that set forth the prison conviction, but we found nothing in either the stipulation or testimony to suggest any unduly prejudicial effect from a second mention of the conviction.  Hopkins contends that the trial court should have limited the evidence in the same way that the trial court did in *People v. Wesson* (2006) 138 Cal.App.4th 959, but that case involved a prosecutor's request to introduce evidence of a sex crime resulting in a conviction against another victim.  There, the court permitted documentary evidence of the charge and conviction to be introduced as propensity evidence.  (*Id*. at p. 969.)  Here, in contrast, the evidence was admitted for purposes in addition to its value as propensity evidence, and the evidence was not limited to convictions that could be presented merely through documentary evidence.  *Wesson* is not applicable here and does not suggest any error by the trial court.  We find no abuse of discretion in the manner in which the court permitted the evidence to be presented.

**DISPOSITION**

The judgment is affirmed.


ZELON, J.

We concur:


WOODS, Acting P. J.


SEGAL, J.*

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14